UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| KATRINA JOY SEAY,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMM'R OF SOCIAL SECURITY;<br><br>　　　　　Defendant. | 5:16-CV-05096-VLD<br><br>MEMORANDUM OPINION<br>AND ORDER |

**Table of Contents**

INTRODUCTION.................................................................................. 1

JURISDICTION .................................................................................. 2

STIPULATED FACTS .......................................................................... 2

    A.   Procedural History.................................................................. 2

    B.   Background.............................................................................. 3

    C.   Vocational Evidence............................................................... 4

    D.   Medical Evidence. .................................................................. 7

    E.   Claimant and Third-Party Statements................................. 43

    F.   Testimony at Administrative Hearing ................................. 52

    G.   Opinion Evidence ................................................................. 55

    H.   ALJ Decision ........................................................................ 61

    I.   Issues Raised by Ms. Seay in this Appeal ......................... 62

DISCUSSION ...................................................................................... 62

    A.   Standard of Review................................................................ 62

    B.   The Disability Determination and the Five-Step Procedure................. 64

    C.   Burden of Proof. ................................................................... 65

    D.   Whether the ALJ Erred by Finding Ms. Seay's Fibromyalgia was not
        "Medically Determinable"?.............................................. 66

        1.   The Commissioner's Guidance for Evaluating Fibromyalgia............. 67

    2.    The ALJ Did Not Find Ms. Seay's Fibromyalgia was a Medically Determinable Impairment, but the ALJ Incorporated Limitations from Fibromyalgia into the Physical RFC ...................... 69

    3.    The ALJ Did Not Err in Failing to Obtain Dr. Frost's Records .......... 70

E.    Whether the ALJ Erred by Assigning Considerable Weight to Dr. Pelc's Opinions? ........................................................................ 74

F.    Whether the ALJ Erred in Evaluating the Weight Given to the Treating Therapist's Opinion? ........................................................ 86

G.    Whether the ALJ Applied the Proper Standard to Determine the Credibility of Ms. Seay and Her Mother's Testimony? ...................... 102

    1.    The Law Applicable to Credibility Determinations......................... 102

    2.    Summary of Ms. Seay and her Mother's Statements...................... 104

    3.    Analysis of the ALJ's Credibility Evaluations ................................. 109

H.    Whether the ALJ Erred By Relying on Total Numbers of Jobs in the United States at Step Five?............................................................. 116

I.    Type of Remand ............................................................................ 120

CONCLUSION ............................................................................. 121

**INTRODUCTION**

Plaintiff, Katrina Joy Seay, seeks judicial review of the Commissioner's final decision denying her payment of disability benefits under Title II and Title XVI of the Social Security Act.[1] Ms. Seay filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits. Alternatively, Ms. Seay requests the court remand the matter to the Social Security Administration for further hearing. The Commissioner asks this court to affirm its decision. The matter is fully briefed and is ready for decision. For the reasons more fully explained below, the Commissioner's decision is reversed and remanded.

---

[1]Supplemental Security Income (SSI) benefits are sometimes called "Title XVI" benefits, and Social Security Disability (SSD/DIB) benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See, e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). In this case, Ms. Seay filed her application for both types of benefits. AR236-47. However, her coverage status for SSD benefits expired on March 31, 2004, and she was never insured at the time of her alleged onset date (10/16/12), in that quarter, or anytime thereafter. AR261. The determination that Ms. Seay was never insured during the necessary period to entitle her to Title II/SSD/DIB benefits was not appealed to this court. Therefore, although she applied for both types of benefits, it is accepted that she does not qualify for Title II/SSD/DIB benefits, so this opinion discusses only her application for Title XVI/SSI benefits.

**JURISDICTION**

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of the parties. See 28 U.S.C. § 636(c).

**STIPULATED FACTS[2]**

**A.    Procedural History**

On May 31, 2013, Seay applied for SSD benefits, alleging that she had been disabled since October 16, 2012. AR236. On June 20, 2013, she applied for SSI. AR238.

She had filed a previous claim for SSI on February 25, 2011, which was initially denied on July 21, 2011.[3] AR96, 109.

Prior to hearing, she was sequentially represented by Kay Cox, TANF Disability Advocate (AR120-21); Christine Gingras, a non-attorney (AR122, 234); and Larry Plank, attorney (AR124-25).

The hearing was held in Rapid City on July 22, 2015. AR54. Testifying were Katrina Seay, claimant; Robert Pelc, Ph.D., the ALJ's [Administrative Law

---

[2] The following statement of facts is taken from the parties' joint stipulated statement of facts. See Docket No. 16. The court has made minor modifications such as grammar, punctuation, and incorporating the defined terms from the parties' glossary into footnotes at the appropriate place in the text. Also various statements of fact were rearranged chronologically where appropriate.

[3] The relevance of this date is that the window for reopening an SSI claim closes if the claimant fails to re-apply within two years after the initial denial of the prior claim. 20 CFR § 416.1488. Even then, SSA may reopen the claim only if the agency finds there is good cause to do so, as defined in 20 CFR § 416.1489.

Judge] medical expert; Wilma Goehring, the claimant's mother; and Barry Brown, vocational expert. JSMF 55. Seay was not represented. AR56.

Debra J. Denney, ALJ, issued an unfavorable step five decision on August 26, 2015. AR25-47. On September 6, 2016, the Appeals Council denied the request for review. AR1. Ms. Seay thereafter filed her appeal of the Commissioner's decision with this court on October 20, 2016. Docket No. 1.

## B.    Background

Seay was born in 1983 in Oklahoma City. AR62, 511. She never knew her father, and her mother was alcoholic, bipolar, and addicted to gambling. AR511-12. She had three stepfathers by age 16, and was first sexually abused by a stepfather at age seven or eight. AR511. At age 15 she was abusing cocaine, methamphetamine, marijuana, and alcohol, completed treatment, and remained abstinent. Id.

She lived in approximately seven foster homes, two residential facilities, three detention facilities, and ran away multiple times. AR511. She was a "cutter." AR668.

She reported struggling with her classes in school. AR69. She dropped out of school in the ninth grade due to pregnancy. Id. She obtained her GED at Wichita Area Tech College and stated that school was difficult for her. AR512.

She gave birth to her first child at age 16 while in foster care, and the child was taken by Child Protection Services. AR511. She had another child at age 20, gave him up, and regretted it. Id.

She married Nicholas Seay in 2004 in Alabama; they separated in October 2006. AR237, 239.

She lost parental rights to her two youngest sons in 2010 in South Dakota and exhausted her final appeal of the parental termination order in 2011. AR511. She became pregnant with a fifth child and moved to Kansas. Id. She had her sixth child in January 2015. AR844.

At the time of hearing she was five feet, eight inches tall, and weighed 325 pounds. AR62. She was right-handed. Id. She was divorced and lived with her two children, ages three and six months, in a rent-subsidized apartment in Belle Fourche. AR62-63, 239. She received TANF and food stamps. AR63.

## C.  **Vocational Evidence.**

Seay, by Ms. Cox, TANF Disability Advocate, stated in her disability report that she had worked discontinuously as a cashier in a retail store, fabricator and packager in a meat packing business, fuel attendant at a truck stop, and refrigerator stocker in a retail business. AR281.

Seay testified that she left her last job, as a "fabricator and packager," due to sexual harassment. AR65. Before that she had a full-time job as a fuel attendant, but when she "told the employer that I had medication that I needed to take in order to keep staying working there, they dropped me to part-time and dropped my benefits." Id. When she was hired full-time in this job, Social Services dropped all services. Id. When the employer cut hours to part-time, resulting in loss of benefits, Seay asked her employer to send a letter to Social

Services "so that I could provide for my daughter ... and they refused to do that." AR66.

Before that she worked as a cashier. The ALJ asked, at hearing, "Did that not work out?" Seay responded,

> I have a lot of things that wind up being wrong in social settings when I work....If something that happens while I'm working triggers a PTSD [post-traumatic stress disorder] issue from my past, whatever that traumatic thing might have happened in my past, I get really anxious. I tense up really bad. I feel almost claustrophobic like I can't get out of the situation.... I want to run away and I want to get away from it, but whenever you're in a work environment, you can't tell your employer, oh, I'm sorry, I'm having an anxiety attack, I need a break.... When I have said that in the past to an employer, they let me say that a couple of times before they fire me.

AR66.

The ALJ asked about a job at Walmart from "June up to February of 2010." AR67. The ALJ asked Seay why she left that job. Seay testified:

> The manager supervisor of my department who initially hired me, understood my disabilities, understood that I was on medication to keep working. He unfortunately did not put that in the file and when he died suddenly which no one expected, the management that took over said I'm sorry, we don't have any leniency for you because nothing's in your file that says you take medication or you're given certain exception. And when that happened, they required me to do other things outside the scope of the work that I had been doing.... And it made my physical and emotional disabilities worse than they were. I tried three different positions in that store after that in the course of a few weeks and none of those were working. I got pregnant with my daughter.... I asked management if I could move to another location in the store that wasn't lifting heavy boxes or in a freezer situation because I was pregnant and they said they didn't have anything available.

Id.

Seay's detailed work history is reported at AR248-51. The report shows that from 1999-2012, she was employed by PNS, Inc. ($60.51), Burger King ($278.13), TB of America ($961.41 in 2000, $62 in 2001), McDonald's ($66.94), ITI Holdings ($30), King Soopers ($2569.83), Lane Holding Co. ($64.08), Westaff USA ($1078.38), K-Mac ($390.60), JAK ($3.78), Four Aces Hotel ($94.65), Time Out Lounge & Bottle Shop ($1158.66), Midwest Motels of Deadwood ($58.50), Mineral Palace Hotel & Gaming ($519.39), Decker's Food Center ($452.45), Wendy's ($156.48), Wal-Mart ($1541.22), Labor Ready Southwest ($10.13), HMC Hotel ($45.50), Wal-Mart ($472.36 in 2008, $6821.90 in 2009, $9077 in 2010, $2747.85 in 2011, and $157.67 in 2012), National Beef Packing ($3343.98), and Garden City Travel Plaza ($1996.79). AR248-51.

Seay reported having worked in 20 or more jobs. "I was let go from all of my jobs because I missed too much work because of migraines, or because I was not able to socialize with customers, co-workers or the boss, or because I asked them to accommodate my limitations and they were not willing to." AR341.

She stated that her most successful work was at Walmart. She had worked for Walmart in Spearfish but missed too much work and was fired. AR341. She later worked for Walmart in Rapid City stocking from the refrigerator to the floor. Her boss let her work most of her shift in the cooler. Id. "I had an awesome boss who understood my problems, my limitations and the effect of my medications. He was a kind man. He said you can stay in the

cooler, stock shelves, take your time; we will go by your limitations." This went well for a long time and then he died. AR342. The job lasted a month after that. She could not tolerate being out of the cooler, walked out and never came back. Id.

**D.  Medical Evidence.**

Regional Health Physician flow sheets show that Seay's weight ranged from 275 pounds on November 23, 2010, to 290 pounds on October 2, 2013. AR435.

On August 5, 2012, Seay sought ER treatment for headache with nausea, "similar to previous headaches." She was treated with Percocet[4] and Phenergan.[5] AR394-95.

On September 11, 2012, Seay sought ER treatment for dizziness, lightheadedness, and headache that started at work. AR375-79. The sole abnormal finding was obesity. AR379. On September 12, 2012, she saw Ajay Thakur, MD, to obtain a return-to-work form. She stated that she felt better except for generalized fibromyalgia pain. Dr. Thakur discussed with her the unclear nature of her illness and advised tests to rule out hypothyroidism. AR386.

---

[4] Percocet (Oxycodone/Acetaminophen) is an opioid used to relieve moderate to severe pain.  https://medlineplus.gov/druginfo/meds/a682132.html, accessed March 26, 2018.

[5] Phenergan (Promethazine) is a phenothiazine (dopamine antagonist) used to relieve histamine reactions, anaphylaxis, to relax and sedate patients before and after surgery, during labor, and to prevent and control nausea and vomiting. https://medlineplus.gov/druginfo/meds/a682284.html, accessed March 26, 2018.

Also on September 12, 2012, she sought treatment at C&S Medical Clinic, where Marcia Snodgrass, NP, assessed shortness of breath, muscle weakness, fibromyalgia, and unspecified chest pain. AR401-02. Ms. Snodgrass prescribed Vicodin,[6] Tramadol,[7] and Lisinopril.[8] AR402.

On October 10, 2012, C&S Medical Clinic saw Seay for muscle weakness, unspecified chest pain, shortness of breath, and a skin mass. AR403-04. Ms. Snodgrass refilled Lisinopril and Vicodin. AR404.

On November 29, 2012, Seay sought ER treatment at the Spearfish Regional Hospital for a headache that was worse on the left side. Don Potts, MD, recorded a long history of migraine headaches, that she used to be on Vicodin and Tramadol and this decreased the frequency. He said symptoms were positive for photophobia, nausea, vomiting and neck stiffness. He said she had been diagnosed with fibromyalgia. Dr. Potts treated Seay with Toradol[9] and Phenergan IM. AR521.

---

[6] Vicodin (Acetaminophen with Hydrocodone) is an opioid painkiller. https://medlineplus.gov/ency/article/002670.htm, accessed March 26, 2018.

[7] Tramadol (Ultram) is a narcotic used to relieve moderate to moderately severe pain. https://medlineplus.gov/druginfo/meds/a695011.html, accessed March 26, 2018.

[8] Lisinopril is an angiotensin-converting enzyme (ACE) inhibitor used to treat high blood pressure by decreasing chemicals that tighten the blood vessels. https://medlineplus.gov/druginfo/meds/a692051.html, accessed March 26, 2018.

[9] Toradol (Ketoralac) is an injectable NSAID used to relieve moderately severe pain. https://medlineplus.gov/druginfo/meds/a614011.html, accessed March 26, 2018.

On December 12, 2012, Seay was seen at Behavior Management Systems for a Needs Assessment by Colleen Casavan, B.S., Therapist, and her clinical supervisor, Jenny Greslin[10], MSN, QMHP. AR510. She had been living in Kansas, recently returned to Spearfish, and wanted to resume CARE (Continuous Assistance, Rehabilitation, and Education[11] for individuals with severe and persistent mental illness) services. She was staying with her mother in Belle Fourche along with her one-year-old daughter and boyfriend. Id.

She had discontinued CARE services in 2010. Ms. Casavan reported that she had a clear direction on what she wanted: "I need case management again. I have really bad anxiety, can't focus, and know I get 'sketched out' more than other people do. I don't trust anybody." AR510.

Ms. Casavan reported that Seay feared her daughter could be taken away if the Department of Social Services (DSS) knew she returned to the area since parental rights to her two sons were terminated in 2010. She was trying to secure an apartment and might want to apply for disability again. AR510.

Ms. Casavan summarized her prior treatment: in 2009 she had therapy, case management, and medication management. AR510. In February 2009 she was hospitalized at Rapid City Regional West (psychiatric hospital) because, after Child Protection Services (CPS) took her sons, she had a suicide plan. Id. In January 2010, angry with providers for not advocating to have her children

---

[10] Signature is difficult to decipher, but Jenny Greslind is shown as the BMS Northern Hills Site Supervisor at http://www.bmscares.org/aboutus/meet-our-staff, last accessed March 26, 2018.

[11] http://www.bmscares.org/services/major-mental-illness-adults, last accessed March 26, 2018.

restored to her custody, she terminated services. During this time she saw a private therapist in Black Hawk and thought the therapist was helpful until her therapist went against her in court. Id.

Ms. Casavan summarized additional longitudinal history: psychiatric hospitalization at age 18 after becoming homeless and losing her daughter; hospitalization at age 15 for attempted suicide by overdose, followed by drug and psychiatric treatment. AR510. She had been treated with Depakote, Trazodone,[12] Zoloft,[13] Prozac,[14] and Abilify[15] and did not recall any psychotropic medication being notably helpful.  Her records indicated non-compliance. She was currently on Tramadol and Vicodin for fibromyalgia. Id.

Ms. Casavan reported that Seay had a history of five C-sections. AR510. Prior records showed that at age 15 she was beaten up in a group home, had a

---

[12] Trazodone is a serotonin modulator used to treat depression; it is also used to treat insomnia and schizophrenia.
https://medlineplus.gov/druginfo/meds/a681038.html, accessed March 26, 2018.

[13] Zoloft (Sertraline) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression, OCD, PTSD, and social anxiety disorder.
https://medlineplus.gov/druginfo/meds/a697048.html, accessed March 26, 2018.

[14] Prozac (Fluoxetine) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression, OCD, and panic attacks.
https://medlineplus.gov/druginfo/meds/a689006.html, accessed March 26, 2018.

[15] Abilify (Aripiprazole) is an atypical antipsychotic used to treat symptoms of schizophrenia or episodes of mania or mixed episodes of mania and depression in adults with bipolar disorder. It is also used with an antidepressant to treat depression that cannot be controlled by antidepressant alone.
https://medlineplus.gov/druginfo/meds/a603012.html, accessed March 26, 2018.

CT scan, and a pineal cyst was found but not followed up. AR510-11. She had had migraine headaches since age 11. At age 5 she broke her arm and at age 6 she broke her leg (falls). AR511.[16]

By age 16 she had had three stepfathers. She had an older half-brother and younger half-sister. AR511. She reported a childhood marked by physical, emotional, and sexual abuse. Id. At age 7 a stepfather sexually abused her. Twice she lived with maternal grandparents. Id. She was in about seven foster homes from age 14-18. She was in two residential facilities and three detention facilities. She ran away multiple times. Id.[17]

She gave birth to her first child at 16 while in foster care. She gave birth to four more children, and the youngest was a year old. AR511. She was married from 2004-06. During the marriage her husband was incarcerated and she had a boyfriend. Child Protection Services removed her sons due to reports of her boyfriend physically abusing them. Her rights were terminated and she exhausted her appeals in 2011. Id.[18]

She moved to Rapid City, became pregnant with her [sixth] child, and shortly before that child's birth moved to Kansas. AR511. She "struggled" with public assistance in Kansas and returned to South Dakota, bringing her boyfriend. Id.

---

[16] The Commissioner disputes the relevance of this paragraph.

[17] The Commissioner disputes the relevance of this paragraph.

[18] The Commissioner disputes the relevance of this paragraph.

Regarding substance use, Ms. Casavan recorded that Seay entered treatment at age 15 for multiple substance and alcohol abuse and she denied further use of drugs. AR511.

Ms. Casavan related that Seay had several jobs, mainly cashiering, that she was unable to keep because the hours did not work with the day care schedule. She planned to keep looking for employment. AR512.

Ms. Casavan reported that appearance, affect, and posture were appropriate. Mood was anxious, appropriate, depressed, and relaxed. Thought content was paranoid with suicidal ideation. Body movements were appropriate. AR512.

Ms. Casavan reported that remote memory was fair, insight was poor, judgment was fair, and energy level was moderate. AR512-13. Ability to manage daily living activity and make major decisions was fair. AR513. Speech was appropriate. Thought process was concrete, organized, and rigid. She related to the examiner in a way that was "average." Id. Facial expressions were appropriate and provocative. Id.

Ms. Casavan discussed a diagnostic formulation of "Mood Disorder NOS." AR513. She listed symptoms that supported the diagnosis: anxiety, difficulty concentrating, poor focus, excessive worry on a daily basis, restlessness, and extreme irritability. Id. Seay reported minimal symptoms of depression. Id. She reported at times experiencing racing thoughts, distractibility, and poor decision-making, but not the extreme ups and downs that might indicate a strong bipolar disorder diagnosis at this time. Id. A "rule out of personality

disorder NOS" was appropriate as Seay had a long history of relationship conflicts including personal and work related, and inappropriate behavior within the community, specifically the court system. Id. She admitted to deceitfulness and manipulation. Id.

Ms. Casavan listed Seay's strengths: she sought services on her own and recognized the importance of finding a sense of stability to improve her and her daughter's life. She was very independent and articulated her needs well. Although she struggled with trusting others she seemed willing to seek the help she needed. AR513.

Under the heading "SPMI" (severely and persistently mentally ill) Criteria, introduced by the general criterion, "The individual's severe and persistent emotional, behavioral, or psychological disorder has resulted in at least one of the following," Ms. Casavan checked these boxes: "A single episode of psychiatric hospitalization" and "Has undergone psychiatric treatment more intensive than outpatient care more than once in a lifetime." Under the category "impaired role functioning," requiring the presence of three criteria, Ms. Casavan checked: "Is unemployed or has markedly limited job skills and/or poor work history;" "Lack of social support systems in a natural environment;" and "Requires public financial assistance for out of hospital maintenance." AR514. Ms. Casavan recommended the CARE Program - Intensive. Id.

On December 27, 2012, Ms. Casavan saw Seay to develop a case service plan tailored around securing income to support her and her daughter,

managing her anxiety through case management, medications through her primary care provider, and therapy. AR505.

On December 29, 2012, Seay sought treatment for migraine headache at the Spearfish ER. She had photophobia, said she was unable to keep anything down, and endorsed eye pain. On exam she had a facial droop on the right side; the patient said this was normal and had occurred during the delivery process. AR423.

On January 15, 2013, Samantha Martinez, BMS case manager[19], said Seay's appearance was disheveled and her mood was anxious. She wanted Martinez to go to a meeting with her at the DSS office where she was applying for a cash credit program but was hoping to not have to work, volunteer, or apply. Martinez told her she had to comply with the regulations. AR503. Seay wanted Martinez to sign a document so she would not have to work, volunteer, or apply, but Martinez told her that was not an option since her case was newly opened; she suggested that she could write a letter that Seay was receiving services. Id.

On January 22, 2013, Seay called Ms. Martinez threatening to pack her van and leave because no one was helping her. AR500. Martinez explained that she was being treated the same as everyone else. Seay again wanted Ms. Martinez to sign a document stating that because of her mental disability she was not able to work. Ms. Martinez suggested that Seay sign a ROI for her Needs Assessment to be released to DSS. Id. Seay did not want to release it:

---

[19] Inferred because she referred to herself as "CM." AR503.

"[D]o you not understand.... This is how I lost my kids last time why would I do that same thing again." AR500-01. Seay told Ms. Martinez that she was not allowed to come to her house, to stay away, and then hung up. AR501.

On January 23, 2013, Seay sought treatment for migraine headache at the Spearfish ER. AR525. She stated she'd had one a month for three months. She said that Tramadol made the headaches much less frequent but she was out. Id. Her blood pressure was 140/100. Lee Bailey, MD, treated her with Toradol, Benadryl,[20] Zofran,[21] and IV fluids. He gave her a small amount of Tramadol and Vicodin. Id.

On January 28, 2013, Forrest Brady, MD, Regional Health Physicians in Spearfish, saw Seay for the first time. AR431. She reported migraines, a right wrist cyst, fibromyalgia, anxiety, hip and back pain. Id. Dr. Brady recorded that she had an extensive history involving fibromyalgia diagnosed by Dr. Steven Frost at the pain clinic in 2010. Id. He had recommended injections but Seay

---

[20] Benadryl (Diphenhydramine) is an antihistamine that is also used to treat insomnia. https://medlineplus.gov/druginfo/meds/a682539.html, accessed March 26, 2018.

[21] Zofran (Odansetron) is a serotonin 5-HT3 receptor antagonist, blocking the action of serotonin causing nausea and vomiting. https://medlineplus.gov/druginfo/meds/a601209.html, accessed March 26, 2018. SSRIs exert their beneficial effects in depressive syndromes by increasing brain serotonin levels. They also increase serotonin levels in other tissues, particularly the GIT, which contains 90% of the body's store of serotonin and large numbers of serotonin-responsive cells. Increased serotonergic neurotransmission causes anorexia, nausea, vomiting and diarrhea in other settings, such as carcinoid syndrome, so gastrointestinal adverse effects are not unexpected with drugs that increase tissue serotonin levels. http://link.springer.com/article/10.2165/00023210-199708050-00005, accessed March 26, 2018.

had needle phobia and chose not to. Seay told Dr. Brady that her headaches were markedly better so long as she took Tramadol or Vicodin regularly. She stated that she took Promethazine for migraines, which were provoked, frequently, by anxiety. Id. Dr. Brady diagnosed Anxiety State, unspecified; Chronic Pain Syndrome; and Lumbago. AR432. Dr. Brady noted that Seay was accompanied by her mother. Id. He said she weighed 281 pounds, BMI 42.7, and was obese. He placed her on Cymbalta[22] and gave Seay a prescription for Hydrocodone[23] prn for any pain not covered with the Cymbalta. AR433.

On February 11, 2013, Dr. Brady said that on Cymbalta 30 mg. Seay was using a little less Vicodin. She felt quite a bit better and more wakeful. AR429.

On February 14, 2013, Shannon Howard, LPC, QMHP[24], BMS therapist, reported her and Seay's first session. AR516. The focus was grief and loss over the loss of her two sons to the State. She feared this could happen with her daughter, was stressed and worried all the time. Id. Ms. Howard assessed SPMI criteria, which were unchanged. AR516-17. Ms. Howard and Seay planned counseling 1-4 times a month, and stated the measure of success:

_____

[22] Cymbalta (Duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) used to treat depression and generalized anxiety disorder. https://medlineplus.gov/druginfo/meds/a604030.html, accessed March 26, 2018.

[23] Hydrocodone is an opioid used to relieve severe pain in people who are expected to need medication to relieve severe pain around-the-clock for a long time. https://medlineplus.gov/druginfo/meds/a614045.html, accessed March 26, 2018.

[24] http://www.bmscares.org/about-us/meet-our-staff, accessed March 26, 2018.

> She will know she is successful when she is able to go out in public and not look over her shoulder, which she does all the time; when she is not isolating as much; and when she feels she has dealt with her grief and is not triggered by visual reminders to the point that she is overwhelmed with sadness each time.

AR508-09.

On March 4, 2013, Ms. Howard recorded that Seay felt trapped in her home out of fear of seeing people she did not want to see. She had gained little insight. She did refrain from impulsively moving forward with a homeless man she met on line. AR596.

On March 6, 2013, Ms. Casavan reported that Seay was "very disturbed" because an agency contacted her for help finding her ex-husband to serve civil papers. AR495. The State was also pressuring her for information about the father of her child as she was receiving assistance and this was a requirement. Id. She said she wanted nothing to do with the father, would not say who he was, and planned to talk with her DSS worker about it. She lived in constant fear of CPS entering her life again. Id.

On March 12, 2013, Ms. Casavan reported that Seay "focused on her recent lottery win" and the stress of deciding what to do with it. AR493.[25]

On March 15, 2013, Dr. Brady saw Seay for a complaint of "bad migraines." AR422. She said her back pain was better on Cymbalta, "knows when she misses a dose." She gave a history of "[h]umongous stress and anxiety." She was interested in seeing a chiropractor for her migraines. Id. Dr. Brady again assessed chronic pain syndrome; anxiety state, unspecified;

---

[25] The Commissioner disputes the relevance of this paragraph.

and headache. He agreed to refer her to a chiropractor. Dr. Brady prescribed medications including Cyclobenzaprine, Cymbalta, and Hydrocodone, noting that she was "quite careful" with use of Hydrocodone. Id.

On March 19, 2013, Seay had therapy with Shannon Howard. AR491. On March 20, she had a session with Ms. Casavan. AR489. On March 26, 2013, she had a therapy session with Ms. Howard. AR486-87.

On April 1, 2013, Seay met with Ms. Casavan. AR485. She said she was seeing a chiropractor. Id.

On April 15, 2013, Dr. Brady assessed her conditions, reported that she weighed 279, and reported their discussion of her possible pregnancy and how to address it. AR414.

On April 15, 2013, Ms. Casavan recorded Seay's complaint of a lot of anxiety, said she was in a pleasant mood but was no longer on speaking terms with the girl she developed a recent friendship with, who has been staying with Seay, along with her son. AR481. Seay would not allow her back into her home while drunk, and the girl accused her of kidnapping her son. Id. No charges were made. Id. Ms. Casavan commended Seay for ending the friendship. Id. Ms. Casavan stated, "Katrina also shared she found out she is five weeks pregnant." Id. "She has concerns about having to get off pain killers due to her chronic pain." Id.

On April 16, 2013, Ms. Howard recorded that Seay had met a man on the internet and now she was pregnant with her "6th whoops" pregnancy. AR479.

She had immediately weaned off medication but said she could not function without it. "Katrina was very disorganized in thought today and scattered from subject to subject, seemingly overwhelmed with this news." Id.

On April 24, 2013, Seay saw Regan Hill, MD, Regional Health Physicians, Spearfish, for obstetric care. AR451.[26]

On April 26, 2013, she met with Ms. Casavan to talk through problems and conflicts. AR477.

On May 5, 2013, Seay was treated at the Spearfish ER for miscarriage. AR527.[27]

On May 14, 2013, Ms. Howard provided therapy and helped Seay process her loss. Ms. Howard reported that Seay spoke in a slow, deliberate, focused manner; had a flat affect; and had met a man amidst this crisis. "Katrina will not financially help this man come see her." AR474-75.

On May 21, 2013, Seay met with Ms. Howard. She was upset and angry because she saw her old therapist, involved in a past child custody case, in the waiting room. Ms. Howard helped her work through the anxiety. AR473.

On May 22, 2013, Seay was brought to the ER by emergency medical services after she swerved to miss an animal and ended up in three inches of water in the ditch. Dr. Krista Birkelo wrote, "She is terrified of water and had an anxiety attack." She had paraspinal tenderness, was alert and oriented with

---

[26] The Commissioner disputes the relevance of this paragraph.

[27] The Commissioner disputes the relevance of this paragraph.

intermittent confusion. The clinical impression was concussion and neck strain. AR530.

The CT of her thoracic spine showed multiple small Schmorl's nodes, small anterior and lateral osteophytes, and mild levoscoliosis. AR534.

Cavum septum pellucidum[28] was revealed by a brain CT in the course of workup after her May 22, 2013 car accident. AR533.

---

[28] Cavum Septum Pellucidum:

    Center for Science & Law, Neurolaw Class. 1999. "Psychopathy: a Misshapen brain." The septum pellucidum is a region associated with the limbic system that first forms as bilateral tissue flap in the ventricles. During late development, the two tissue flaps fuse together to form the septum. If the two tissue flaps do not fuse, then it creates a cavity between the ventricles known as the cavum septum pellucidum (CSP) and the CSP is a structural marker of limbic system maldevelopment. A June 2010 study by Dr. Adrian Raine at the University of Pennsylvania found that individuals with a cavum septum pellucidum (CSP) were more likely to exhibit antisocial or psychopathic behaviors. http://www.neulaw.org/blog/1034-class-blog/3276-psychopathy-a-misshapen-brain, accessed March 26, 2018.
...........

    British Journal of Psychiatry. Aug 2010. 197(3) 186-192. Raine et al. "Neurodevelopmental marker for limbic maldevelopment in antisocial personality disorder and psychopathy." Individuals with a [cavum septum pellucidum] have significantly higher levels of antisocial personality, psychopathy, criminal charges and convictions compared with those lacking a CSP. http://bjp.rcpsych.org/content/197/3/186.full, accessed March 26, 2018.
...........

    Psychiatry Res. 2010 Feb 28; 182(2):108-113. Beaton et al. "Increased incidence and size of cavum septum pellucidum in children with chromosome 22q11.2 deletion syndrome." "Given the variety of conditions in which enlarged cavum septi pellucidi is found, it is most appropriate to consider this anomaly as a nonspecific marker for disturbed brain development." http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2904971/, accessed March 26, 2018.
.........

    Neurology MedLink. Original June 16, 1995, last updated March 9, 2017. Barth et al. "Cavum septi pellucidi and cavum vergae." The midline cavities are essentially temporary embryonic structures that involute during late pregnancy and infancy. Persistence of these structures beyond this period

On June 4, 2013, Skylar Bransky, BMS CARE Emergency Services, reported a 54-minute phone call from Seay. AR467. Seay stated she wanted to leave her house, take off and run away from everything.  AR469.  She'd had an argument with the car mechanic about getting her car back, the police came to her door at 6:30 p.m., and she would not let them in. They said they would get a warrant, and she finally talked to them. Id. They told her that her only option to get her car back was small claims court. They wanted to know if she was going to hurt herself. She said no, and they left. On May 31, 2013, she had gone to tow her car away from the mechanic because he had not fixed it and she needed to turn in her rental car. Id. He called the police and she spent the night in jail. Ms. Bransky reported that Seay agreed that Ms. Bransky and Ms. Howard would come up with a plan of action before she resorted to disappearing. Id.

On June 7, 2013, Heather Armstrong, LPC, QMHP, Behavior Management Systems, reported that Seay was having stress related to law enforcement, her mom, a limited social support system, and a mechanic not

---

does not cause any symptoms but is statistically related to malformations and psychiatric disturbances, mainly dependent on size.
http://www.medlink.com/article/cavum_septi_pellucidi_and_cavum_vergae.
Accessed March 26, 2018.
..........
 Psychiatry Res. 2010 Feb 28;181(2):108-13. Beaton et al. Cavum septum pellucidum occurs with chromosome 22q11.2 deletion, and a "large CSP may be a biomarker of atypical brain development. The implication of these larger CSP for cognitive and behavioral development is a topic in need of further investigation." Increased incidence and size of cavum septum pellucidum was found in children with chromosome 22q11.2 deletion syndrome.
http://www.ncbi.nlm.gov/pubmed/20074913, accessed March 26, 2018.

fixing her car. AR466. Seay stated that police had come to her house twice this evening because of a theft her mother reported via the internet. Seay said she would not answer the door, she feared arrest and loss of custody of her daughter, and this was creating significant anxiety. Id. She denied stealing money from her mother. She talked about relocating to an area where she could address her anxiety in a more supportive environment. Id.

On June 10, 2013, Ms. Howard reported that Seay was very emotional, her face was flat, and her emotions were blunted. Her daughter was with her and Seay showed patience and proper parenting skills. AR471. Her Camaro was still in the possession of the mechanic. She had given him half the money to fix it, and he would not fix or return the car until he received the rest of the money for repair. Id. Her van was broken down, she had used her insurance money to fix the Camaro, and had to return the rental car. She had been arrested for disorderly conduct when she went to get her car and had to be in court on June 28, 2013. Id. Ms. Howard helped her process her irrational thoughts about leaving Belle Fourche just because of her mom. It was decided that Seay would "focus on what she can control, Zy, herself, and finding a way to fix the car." AR471.

On June 18, 2013, Ms. Howard reported that Seay was excited because "a businessman" paid for her car to be towed and repaired, lent her a car, charged her only $1,000, and asked her to pay what she could. AR463. Seay "processed her disbelief that there were good people out there." Id.

On June 27, 2013, Ms. Casavan and her clinical supervisor, Randy Allen, reported a six-month review. AR577-79. During this period, Seay had found housing, accessed DSS and other programs, began therapy, and received medications from her primary care physician. AR578. She was pregnant, miscarried, and processed those feelings fairly well with her therapist. Id. In June she was in crisis over financial difficulties with her vehicle; was in conflict with her mother, who accused her of theft via the internet; and there was police involvement and an arrest for disorderly conduct. Id. She indicated she still feared Child Protection Services involvement, but had been successful avoiding further involvement. The BMS reviewed listed factors constituting medical necessity for continued services: Seay struggled with ongoing anxiety, struggled with problem-solving skills and poor decision-making, had a limited support system, and struggled with interpersonal relationship issues. Id. Without services she could turn to impulsive decision-making leading to legal issues, CPS involvement, and setback in the progress made toward mental health recovery. Id.

On July 9, 2013, Ms. Howard recorded that the man Seay dated for a week was in jail for violating a TRO. "When he is bailed out she will let him move in...."AR572. "Therapist challenged Katrina that ... she must focus on the red flags she sees instead of the feelings. Therapist also reminded her she has only known him for one week...." AR571.

On July 17, 2013, Ms. Howard wrote, "She did listen to her instincts and did not use her car title for bail but instead used the money he had which he

was upset about but later understood. Her issues include his smoking, drinking, and potential for wanting to use her money...." AR569. On the other hand, he was "good with Zy, goes to work, a good mechanic, and treats her nice." AR570.

On July 18, 2013, Ms. Casavan reported that this man stole gas from her vehicle, tried to steal her pain medications, and she filed a police report. AR568. "She seems to realize she needs to get to know someone before allowing them to stay with she [sic] and her daughter or try to fix their issues." Id. Ms. Casavan added that Seay had made it to court last week regarding her disorderly conduct charge "involving heated argument with an officer while trying to get her car back from a mechanic." Id.

On July 23, 2013, Ms. Howard wrote that she continued in the relationship, that the man had agreed to treatment, and Seay hoped he could get his drinking under control. AR566.

On July 25, 2013, Ms. Casavan and Seay discussed the relationship with this man and her lack of financial stability. Seay was in the pre-contemplative stage with regard to finding employment. AR564.

On July 30, 2013, Seay sought ER treatment for a migraine. She stated that she'd had a headache more than a week, had sought chiropractic treatment earlier in the day without improvement, and had vomited four times. AR535. A pregnancy test was negative. AR536. The ER provider treated her with Toradol and Zofran. Id.

On August 19, 2013[29], Ms. Casavan called Seay, who said she was doing "okay," and reported that there was a warrant for her arrest for failing to appear in court last month. AR562. Ms. Casavan attempted to offer solutions "but Katrina struggled with accepting any responsibility with the situation nor how to address it." Id. Ms. Casavan wrote that the case manager "encouraged [Seay to] consider having her mother watch her daughter in case she needs to go to jail," but Seay stated "she would rather have CPS step in than have her mother watch Zi." Id. Seay said she had little money and had used most of her resources and the communities'. Ms. Casavan offered to travel to Belle Fourche to see her, but Seay did not answer the phone when Ms. Casavan called back to set a time. Id.

On August 21, 2013, Seay returned Ms. Casavan's call and spent a great deal of time talking about finding affordable car insurance.[30] AR560. Ms. Casavan asked about the warrant for missing her court date. Seay did not want to "figure" that out right now. Ms. Casavan explained the consequences and Seay said little. Id.

On August 27, 2013, Ms. Howard wrote that Seay reported ending the relationship with "Billy." AR557. Seay talked about her fears of being alone, of being like her mom, and bringing men in and out of her daughter's life. Seay

_____

[29] Seay's schedule with BMS included at least weekly visits. There may be missing records for the previous month.

[30] The Commissioner disputes the materiality of this information.

reported feeling overwhelmed, alone, and frustrated. They agreed that she would try to stop going on websites to find men. Id.

On August 28, 2013, Ms. Casavan reported, "Katrina said her TANF has been shut off for the month of September due to not complying with child support paperwork identifying the father of her child. She is very angry about this...." AR555. She subsequently was told that if she completed her paperwork by Friday she would receive her benefits again. Seay expressed anxiety about having her daughter's father involved in the future. Id.[31]

On August 30, 2013, Seay told Ms. Casavan she was "a little happy as she met someone on-line. She does seem to have some insight as she recognizes this may not be a good place to start a relationship however is in the precontemplative stage of change." AR553. Seay was ambivalent about her car dilemmas, whether to get rid of one to be able to repair the other. "CM followed up on Katrina's plans regarding her missed court date however she doesn't plan to address this at this time despite negative consequences that may follow." Id.[32]

On September 10, 2013, Ms. Howard reported that progress was minimal, and isolating had increased. AR540. Ms. Howard assessed overall progress as "unsatisfactory." "Katrina has had many issues that have taken away from her ability to meet her goals.... Without continued services Katrina is most likely to report an increase in mental health symptoms." Id.

---

[31] The Commissioner disputes the relevance of this paragraph.

[32] The Commissioner disputes the relevance of this paragraph.

On September 12, 2013, Ms. Casavan reported that Seay had requested a meeting in the park instead of her apartment, which was being inspected. AR549. She felt too anxious to be in her apartment "as she doesn't like people in her home." There were several things she had been told to fix that she had not gotten to. "CM encouraged her to take responsibility by following through and addressing concerns before they turn into issues leading to increased anxiety. Katrina was receptive however did not commit to changing her behaviors." Id.

On September 17, 2013, Ms. Howard reported a therapy session. AR547. She "challenged irrational thoughts ... and encouraged Katrina to take things slow with relationships...." AR546.

On September 24, 2013, Ms. Howard reported a therapy session in which Seay tearfully processed the relationship with the man she was with when her children were taken. AR545. Ms. Howard noted that Seay was "struggling that she still has feelings for him." Id. "The session ... focused on these feelings of loneliness and not being understood." Id. The plan: "Katrina will try to get out of the house once this week." Id.

On September 27, 2013, Seay sought ER treatment for "acute on chronic back pain" after moving furniture at her apartment. AR590. She had difficulty moving her right leg due to pain. She was treated with Toradol and Norflex, and given a prescription for Flexeril. She had a prescription for Norco at home. Id.

On October 2, 2013, Ms. Casavan wrote, "Katrina reports that she has been struggling with severe anxiety related to stressful situations." AR543. She

had gone off her Cymbalta when she miscarried and had a PCP appointment to get back on. Id. She reported an extensive history of back issues. Id.

On October 2, 2013, Dr. Brady referred Seay to an obstetrician, with the note: "Pregnant, trying to decide if she can continue with pregnancy." AR411. Height and weight were 68 inches and 290 pounds. AR409.

On October 8, 2013, Ms. Howard reported that therapy focused on Seay's issues with her mother. The plan: "Katrina will think about attending a social at her daughter's head start program to meet other moms and try to build social support." AR647.

On October 14, 2017, Ms. Casavan reported that Seay continued to have car issues, hoped SSI would resolve this, and seemed disinterested in other alternatives. AR645. She had been able to get back on medication and was starting to feel that she was managing her stress better. She was afraid to renew her driver license due to the outstanding warrant. Id. Regarding a former alcoholic boyfriend: "She said she plans to drop him off at his halfway house today." Id. Ms. Casavan supported this. She said that due to CARE restructuring, Seay was to be assigned to a new case manager. Id.

On October 15, 2013, Ms. Howard reported that the focus of therapy was the male friend who was in rehab. AR643. "Katrina will not accept phone call[s] from this man this weekend as she is gaining insight that she puts herself around others that are needy to avoid rejection...." Id.

On October 22, 2013, the new case manager, Dana Studt, reported that Seay discussed stressors revolving around transportation, and struggled to follow through with ADLs like bathing, cleaning, and laundry. She often felt overwhelmed. AR641.

On October 29, 2013, Ms. Howard reported the focus of therapy was Seay's disappointment in her mother and a growing friendship with a female friend, Jenna. AR639.

On November 5, 2013, Ms. Howard worked with Seay on the pros and cons and potential boundaries she needed to set so as not to be drawn into a relationship she did not want. AR637.

On November 8, 2013, Ms. Studt helped Seay find a dentist who took Medicaid. AR635. Ms. Studt wrote that Seay had concerns about anxiety levels and Ms. Studt helped her compile a list of concerns to take to her PCP at an appointment this afternoon. Id.

On November 8, 2013, Seay saw Dr. Brady. AR585. She wanted medication to get through the anxiety of seeing the dentist. She told Dr. Brady that the anxiety about just making an appointment was almost too much for her. Id. "She apparently does not always think things out well at the time...." Id. Dr. Brady increased her Cymbalta to 90 mg. AR588. He prescribed Lorazepam[33] 1 mg. an hour before the procedure and she could repeat at the time of the procedure if she needed to. Id.

---

[33] Lorazepam (Ativan) is a benzodiazepine used to relieve anxiety. It is also used to treat irritable bowel syndrome, epilepsy, insomnia, nausea and vomiting from cancer treatment, and agitation caused by alcohol withdrawal.

On November 12, 2013, Seay saw Ms. Howard, reporting a plan to get a guy to buy a car that she would use. She had mixed feelings about this, and Ms. Howard reviewed pros and cons and how to maintain boundaries. AR633. Also on November 12, Shawn Bitz of BMS reported that "Katrina called in tears" because her dentist said to take four Lorazepam tablets before her visit, and she did. AR631. The dentist appointment was then canceled. She stated that she had been "out of control and sedated" all day and her mother took care of her child but left before Seay was ready for her to leave. Id. "Katrina called in an almost panicked state, afraid she would not be able to take care of her child." Id. She was able to walk, was aware of her surroundings, knew the date and day, and calmed down in the course of the conversation. Id.

On November 13, 2013, Ms. Studt spoke with Seay on the phone after Seay failed her appointment. Seay said she had taken 5 mg of Lorazepam the day before, for a dentist appointment, and blacked out. Seay said she would call her case manager when she felt recovered enough to drive. AR628.

On November 22, 2013, Ms. Studt wrote that she "phoned Katrina back after she left CM a frantic voicemail stating that she needed help." AR627. Seay was currently pulled over, with her daughter and a friend, and a policeman wanted to arrest her on her bench warrant. Seay demanded that Ms. Studt drive to Belle Fourche to either give her $275 to pay the fine, to keep her from being arrested, or to take her daughter. Id. Ms. Studt reviewed the limitations of case management. Seay was not receptive, again made demands, and Ms. Studt "enforced boundaries." Seay hung up on the CM. Id.

On November 25, 2013, Ms. Studt reported a phone conversation with Seay, who said she was calmer today and had arranged with the police to address the warrant. Seay told Studt that she should have come on Friday, when told to, as the case manager was her primary support. Ms. Studt "validated feelings," reviewed Seay's role in this, and Seay "hung up on CM." AR625.

On November 26, 2013, Ms. Howard reported a conversation in which Seay related that she had been pulled over for a license plate violation and was informed that she had a bench warrant. AR623. She spent 45 minutes trying to finding someone to give her $200 or watch her child, and she was not able to get ahold of her mother. Id. Seay said this resulted in her "losing it on Dana" and was unsure if the relationship could be fixed. She found out she was getting $15 too much for housing and would be evicted if she could not pay $200 by the end of the day. Id. This put her in "emotional tailspin" and "she fled to Keystone" to the house of a man she has been talking to on a dating site. "Everything was perfect about the night except the location of where he is living and lack of running water." Id.

On December 9, 2013, Ms. Studt stated that Seay acknowledged behaving poorly during the last interactions with her CM. AR616. Seay was again seeing someone she met on a dating site. "CM expressed concern that Katrina's boyfriend is already living with her and expressed possible safety concerns regarding her daughter. Katrina...agreed to not allow her boyfriend to have unsupervised contact with her daughter until she knows him better." Id.

On December 10, 2013, Ms. Howard stated the main features in a therapy session:

> Katrina reports that things with Mike have evolved to going up there for Thanksgiving and him coming home with her.... He has been with her a few weeks and she has no issues. She feels he is motivated to get a job, willingly looks for work, and is helpful with Zy and supportive of her. One concern is his cigarette and drinking habits that she is supporting now while he looks for work but feels he is communicating that he ... will reimburse her.

AR619. Ms. Howard encouraged her to "please take things slower...." She met Mike "who was polite and appeared attentive to Zy." Id.

On December 11, 2013, Dr. Brady recorded that Seay was doing much better on Trazodone for sleep and planned to use Trazodone for her next dental appointment. AR925. Assessments included chronic pain syndrome; anxiety state, unspecified; sleep disturbance, unspecified. AR927. He continued Hydrocodone for pain. Id.

On December 16, 2013, Ms. Studt helped Seay "process stressors" on the phone. AR617. She stress the importance of "addressing things in a timely manner as this tends to be easier than fixing them down the road." Id. "Katrina did not agree to apologize for her behavior today." Id.

On December 17, 2013, Ms. Howard reported that Seay expressed frustration and anger that "Mike has left.... She is also reporting she is pregnant due to a mix of antibiotics while on birth control. She is upset that mom was willing to buy Mike liquor, cigarettes, a phone card and drive them up there to drop him off yet she never offers to help her financially." AR614.

Now she was "strapped for cash as he contributed nothing." Seay was discouraged and upset. Zy was extremely disruptive in session. Id.

On December 23, 2013, Ms. Studt stated that Seay continued to have difficulty taking responsibility but did acknowledge her part in her current situation, adding, "I just don't want to talk about that right now." AR612. She vented and expressed some sadness that her relationship was over and her former boyfriend was already living with someone else. Id.

On January 7, 2014, Ms. Howard observed that Seay looked "high" and upset. AR610. Seay stated that she had so much anxiety having to leave her apartment that she took three Valium instead of the normal two. Seay stated that her pain was so high, and anxiety so high, she was having a hard time functioning at all. Id. She said her house was not in the normal clean state as she spent time scrubbing her mattress and had thrown out all sheets. Id. She was upset that she had not protected her daughter and felt guilty that she allowed this man into her home. Zy had no idea what happened, was not alone with the man, and did not witness anything. Seay reported that she was raped in her bedroom, a knife was involved, and she would not go into further detail but blamed herself for letting him in. Id. Now she was taking care of Zy but that was it. Id. "She crashes when Zy sleeps and has not been able to leave the house yet reports not even feeling safe in her house as it is where the rape occurred." Id. "She states that the cops have informed her there is not enough evidence to press charges as it is her word against his." Id. "She had difficulty gaining insight due to being on higher dose of medication" Id.

On January 21, 2014, Ms. Howard reported therapy focusing on how Seay could get her life back on track and pull herself out of a financial mess. AR608. She did not want to discuss the rape. She would focus on not bringing someone into her life to save her but get through each day on her own and get out of the house. Id.

On January 28, 2014, she did telephone case management with Ms. Studt. AR606. They discussed current legal issues. "Katrina displayed little insight today into the role she has played in these situations and took little to no personal responsibility." Id.

On February 3, 2014, Seay sought ER treatment for migraine headache and vomiting. AR592-93.

On February 5, 2014, Ms. Studt recorded that Seay hoped the judge would throw out her case on Friday, that due to ongoing migraines her PCP had referred her to a neurologist, and that her therapist did not feel group therapy would be appropriate at this time. AR604.

On February 5, 2014, BMS reported its six-month review. Progress toward Seay's goal ("deal with my stress better" (AR714)) was satisfactory. AR715. "Although Katrina can often be insightful, she was not able to meet her objective over the last six months." The therapist noted that in six months she had entered into three short-lived relationships and reported that she felt happier and more emotionally stable when in a relationship. Id. The BMS report also noted: "Although she seems receptive to the idea that she is

intelligent enough to go on to further her education and possibly work, provided her anxiety is better-managed, Katrina is primarily in the precontemplative stage of change." Id. She remained fairly crisis-oriented, due in large part due to her tendency to avoid dealing with issues. Id. "For instance, her failure to address an old medical bill resulted in having her Medicaid coverage suspended. Other examples were noted. Id.

Medical justification for continued services was stated:

Katrina continues to require the support of the CARE program as she works towards recovery. She often reports that her high anxiety prevents her from following through with various tasks/appointments; she is currently working with her [PCP] in finding a satisfactory medication plan. She may benefit from increased support from her case manager in this area[.] Katrina's choices and patterns of avoidance often create stressful situations from [sic] her. Continued support from both her case manager and therapist may help Katrina make improvements in this area[.] If she were to close from services at this time, Katrina would likely stop making progress and could potentially require hospitalization.

AR715.

On February 14, 2014, Ms. Casavan stated that Seay clearly had developed more insight, although she continued to have a pattern of on-line relationships and was thinking of moving to a different state "where an on-line relationship is." AR599-600. Her legal troubles had been resolved and she was to write an apology letter to an officer. AR600.

On February 17, 2014, Seay saw Helen Kuehlman, DO, at Regional Health Physicians for acute pharyngitis. AR949. It was noted that she needed to see Dr. Brady to sign a pain contract in order to fill her Vicodin. Id.

On February 25, 2014, Ms. Howard reported that "things with the man from Wyoming are not going to work as she is catching too many [red] flags.... She met another man today whom she liked until she heard he was in shelter...." AR598.

On March 25, 2014, Ms. Howard reported another case service review noting that Seay was feeling overwhelmed by life stressors, leading to isolation and increased depression. The measure of success was to get out of her house and engage in one activity a week, use skills to deal with stress, make decisions best for her and Zy, and emotional stability. AR722-23. Her progress had been unsatisfactory, with two pregnancies, two miscarriages, a rape, numerous relationships with men only to be left financially more challenged, continued strained relationship with her mother with her mother twice notifying the police to do a welfare check, continued isolation, interactions with law enforcement, and struggles with reliable transportation. AR726. Medical necessity for continued services was found: "Without ongoing therapy Katrina would most likely deteriorate to the point of needing hospitalization and potentially lose custody of her child. Id.

On June 3, 2014, Dr. Hill saw Seay for her pregnancy and listed diagnoses, assessments, history and treatment plan: maternal obesity syndrome, history of five cesarean deliveries, high-risk pregnancy, primary fibromyalgia syndrome, backache. AR750-51.

On June 20, 2014, Dr. Kuehlman reported that Seay came to the clinic with her case manager to establish care. AR943. They discussed how to treat her conditions, and what medication to use or avoid in view of her pregnancy. AR946.

On July 24, 2014, the BMS six-month review was reported and a new case service plan was created. AR705-13. The current goal was to "deal with my stress better." AR705. Progress toward this goal was "satisfactory" and "Katrina continues to struggle to manage her anxiety and stress." AR 706. Katrina acknowledges that she does not always address important issues in a timely manner and finds them more overwhelming when they have become emergencies.... On a few occasions, Katrina did stop attending appointments, did not return calls, and isolated in her apartment. She has since set up her voicemail and has been returning messages in a timely manner. Katrina had two miscarriages and is now thirteen weeks pregnant. She recently contacted an adoption agency in California and did meet prospective parents. Id. She had not made a decision about adoption. Id. "Dr. Brady refused services after Katrina had missed several appointments," and she changed to a new PCP. Id.

Medical necessity was found for continued services. AR712. A new CSP (case service plan) was developed. Id. The objective: "I would like to work on moving to Spearfish" where she did not have conflicts with anyone and would be better able to access BMS and medical care. AR708.

On July 22, 2014, Ms. Studt reported a case review and new service plan. AR704-10. Clinical supervisor Greslin signed off. AR707. The main goal of

the plan, as stated by Seay, was: "I want to be able to leave the house and really, honestly feel happy about taking my child to the park." AR708. The statement of medical necessity noted significant progress toward recovery. AR706. She was said to have excellent insight into her tendency to avoid stressful situations until she could no longer ignore them.

> Continued encouragement and assistance may help Katrina improve her ability to address things in a more timely manner, thus reducing stress and anxiety.... If she were to close from or reduce services at this time, she would likely have difficulty moving through the stages of change, could become increasingly isolated and depressed, and might become increasingly dependent on the system.

AR708.

On September 30, 2014, Ms. Howard reported that she and Seay worked out a new goal with a March 28, 2015 target date. AR693. The goal was to "learn how to be better, to deal with life instead of ignore the problems, to be able to do what I need for Zy and me and figure out what to do about the baby. I want to make better choices." Id.

On November 11, 2014, Jessica Donner, Regional Health Physicians, reported an OB visit. The patient was no longer doing adoption due to stress and planned to keep the baby. She reported that she got fuzzy spots in her vision when she changed positions. AR792-93.

On January 15, 2015, Marvin Buehner, MD, at Black Hills Ob-Gyn, reported that Seay would have a C-section on January 21, 2015. AR663. She had some complications with the procedure. AR663.

On January 29, 2015, Jessica Myers, BMS, wrote an individualized action plan (IAP). Objectives were identified to achieve the goal to obtain housing. The goal would be met when Seay made it to the top of the Section 8 voucher list, which could take 12 months. AR689. Goal 3, "I want to be able to handle normal life," would be supported by continued communication and work with case management. AR690. The goal would be considered met when Seay felt more comfortable handling daily activities outside the home. "Katrina gets anxiety when she leaves her home to do anything." She also had anxiety having people come into her home. Id. Goal 4 was to get back on medications when Seay was done breast feeding. AR691. "Katrina does not have a current psych eval so she cannot get meds through a PCP or our CNP. Id.

On March 10, 2015, Ms. Howard discussed Seay's goal: "[L]earn how to deal with stress and be able to take care of me and Zy." AR685. Ms. Howard noted that Seay got anxiety when she left her home or had people come into her home and when she had to talk to someone in authority. AR686-87. The new goal, "Handling my emotions so I can take care of my kids and deal with stress better," would be met by getting out of the house three times a week, feeling able to take care of kids and self, managing emotions better, communicating with mom better, and "anxiety not at 10 when out of house." AR687.

On March 19, 2015, BMS medication management was reported by Ann Hodgman, RN, MSN, CNP. AR672-73. She reported the History of Present

Illness (HPI): "[A]dmits crying spells, helpless/worthless, irritable/angry -
yelling, throw[ing] objects, wt is up due to implanted birth control; sleeping 6
hrs per night due to being up with the baby; wakes up worrying, biggest stress:
finances; panic attacks daily for years; avoids crowds; handwashing to excess,
check locks." AR668. At age 15 she had been a cutter. *Id.* In 2008 she was
suicidal, triggered by the loss of her kids, but she did not make a suicide
attempt. Id. The HPI continues: "[E]xcess energy - pressured speech/no need
for sleep – lasted 1 day - 1x per week for years occurs more often the
depression lasting one week, mind racing, mood swings, troubles focus/ADHD
in childhood - no dx no tx." Id. Seay rated anxiety at 10 and depression at
7/10. She denied feeling hopeless, hallucinations, homicidal. Id. She had not
been on mental health medications since 2009. Id. She was previously on
Prozac and Abilify, she could not remember how long. Id.

Ms. Hodgman reported the longitudinal history set out above, with minor
variations and inaccuracies (oldest child age 29). AR669. She reported the
foster care and the abuse. AR670. She reported Seay's history of pregnancies –
children ages 15, 10, 8, 7, 3, and 2 months, with several fathers. Id. She
reported the ages of the children when Seay lost them: 14 months, at birth, 14
months, and two and one-half years. Id. Ms. Hodgman reported her mental
status examination: Appearance and posture normal. Build was overweight.
Eye contact was intense. Attitude toward examiner was mistrustful. Mood was
anxious. Seay was tearful. Her affect was labile. Speech was over productive.

Thought process was logical, perception was normal and she denied hallucinations. Thought content was characterized by preoccupations and ruminations, and was depressive and self-deprecatory. Seay stated, "I hate the lady who took my kids away from me." Her cognition appeared normal and Ms. Hodgman estimated average intelligence. Regarding capacity for insight, Seay had difficulty acknowledging psychiatric problems. Regarding judgment, her ability to make reasonable decisions was impaired. AR671. Ms. Hodgman assessed mood disorder, generalized anxiety disorder, and unspecified personality disorder. She prescribed Lamictal[34] and Hydroxyzine.[35] Id.

On April 14, 2015, Dr. Kuehlman reported that Seay wanted a referral to pain management for chronic back pain that made it difficult to get going in the morning. Seay reported that her back pain was made worse by bending over. AR856. She stated that Seay's anxiety level was up since having her son, she was more on edge, and she could snap a little easier than usual. Id. Dr. Kuehlman examined Seay and reported that she was morbidly obese, had an abnormal slightly flat affect, poor dentition, and a crowded airway. AR859.

---

[34] Lamictal (Lamotrigine) is an anticonvulsant also used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar I disorder. It has not been shown to be effective when patients experience the actual episodes and other medications must be used to help people recover from these episodes. https://medlineplus.gov/druginfo/meds/a695007.html, accessed March 26, 2018.

[35] Hydroxyzine (Atarax, Vistaril) is an antihistamine used to relieve allergic itching; it is also used alone or with other medications to relieve anxiety and tension. https://medlineplus.gov/druginfo/meds/a682866.html, accessed March 26, 2018.

She assessed chronic pain syndrome and planned a pain management referral. She assessed anxiety and planned a psychiatry referral. She assessed depressive disorder and prescribed learning about mood disorders. Id. She addressed contraception. She recommended a DASH diet to help her elevated blood pressure, and exercise. Id.

On April 29, 2015, Lisa Kautzman, MSN, CNP, QMHP for BMS, reported a 20-minute session for medication management with psychotherapy. AR700-04. Ms. Kautzman reported the HPI: "mood/sleep/anxiety; She states the symptoms are chronic and are fairly controlled. I am not so great." AR700. Her mood was anxious. AR701. Judgement, in terms of the ability to make reasonable decisions, was impaired. Id. Her diagnoses were unspecified episodic mood disorder, anxiety, dysthymic disorder, and adjustment disorder with mixed anxiety and depressed mood. AR702. The medication Lyrica[36] caused edema, and Lorazepam made her feel hung over. Id. Active medications were Lamictal, Hydroxyzine, and Duloxetine. Id. Ms. Kautzman wrote a medication plan: "Went off Lamictal and Hydroxyzine, attempt Buspirone[37] and

---

[36] Lyrica (Pregabalin) is an anticonvulsant used to relieve neuropathic pain. It is also used to treat fibromyalgia.
https://medlineplus.gov/druginfo/meds/a605045.html, accessed March 26, 2018.

[37] Buspirone (BuSpar) is an anxiolytic used to treat symptoms of anxiety disorders. https://medlineplus.gov/druginfo/meds/a688005.html, accessed March 26, 2018.

restart Cymbalta." AR703. She discussed a trial of Trileptal.[38] She said to keep stress low; monitor mood, sleep, and anxiety; and engage in therapy with Shannon Howard. Id.

On May 27, 2015, Ms. Kautzman assessed unspecified episodic mood disorder, dysthymic disorder, posttraumatic stress disorder, and adjustment disorder with mixed anxiety and depressed mood. AR696. She adjusted the medication doses and discussed a trial of Trileptal. AR698-99. She said to keep stress low and monitor mood/sleep/anxiety. AR698.

### E.    Claimant and Third-Party Statements

On March 23, 2013, Crystal Bach, Social Security employee, reported a telephone communication with Seay. AR99. Ms. Bach stated that Seay was "slow to come up with answers and then gave answers not for the questions asked." AR99. The DDS examiner reported that Seay failed to respond to letters asking her to call. AR100.

On June 20, 2013, Seay submitted her first disability report. AR 278. She named her mother, Wilma Faith Goehring, as someone who could be contacted to help with her claim. AR278. The report was completed by Kay Cox, of the Department of Labor in Spearfish. AR279. Medical conditions alleged were fibromyalgia, anxiety, depression, migraines, back pain, anemia, right leg shorter than left causing uneven hips and pain, confusion/anxiety in public settings, "slips and falls easily," and PTSD. Id.

---

[38] Trileptal (Oxcarbazepine) is an anticonvulsant that is also used to treat bipolar disorder.https://medlineplus.gov/druginfo/meds/a601245.html, accessed March 26, 2018.

Seay, by Kay Cox, reported that she was five feet, eight inches tall and 270 pounds. Id. She stated that she stopped working because of her conditions and other reasons, specifically sexual harassment and false claims. AR280. She believed that her conditions became severe enough to prevent work on February 15, 2002. Id. The level of formal schooling was not reported but she completed a GED in 2000. Id.

The disability report stated that she had been treated at Hintgen Chiropractic Clinic in 2013 for "[w]hiplash, migraines, back pain, hips, neck." AR284. She was in counseling with Diana Smith, MSW, at Serenity Mental Health in Black Hawk in mid-2010 for anxiety, depression, PTSD, attempted suicide, and possible multiple personality disorder. AR285. Her primary care providers at Spearfish Regional Medical Clinic from "2003(?)" to April 2013 were Kerry Greer, Dr. Forrest Brady, Dr. Regan Hill, and Dr. Kullerd, who treated her for "miscarriage, something on uterus found by ultrasound, fibromyalgia, back pain, hip pain, anemia, depression, anxiety, migraines, cold sores." AR286. Dr. Steven Frost, West River Anesthesiology Consultants, had seen her from Fall 2010 to mid-2011 for pain management and psychiatric management. AR287-88.

Seay, by Kay Cox, stated in her disability report that she felt she should have been in special education because of problems concentrating, that she had migraines from age 12 on, that it took three days to recover from a migraine, and that medications (to enable work) caused high blood pressure

that made her feel like she was going to pass out. She stated, "Had much abuse in my childhood and I'm still dealing with the after-effects." AR289.

On July 1, 2013, Seay completed a DDS "Function Report." AR291. She stated,

> I have severe anxiety that makes me freak out. I don't show it on the outside but on the inside my heart is pounding, blood pressure goes up, I sweat, and I can't focus on the task at hand. Because of these things I mess up on my job. This has happened with every job I have had including being fired. I don't have good boundaries and it has caused problems in my jobs.

AR291.

> Seay reported her daily activities at AR292, continued at AR298:

> I wake up when my daughter wakes me, from 8:30 - 11 a.m. I take care of daughter's need. Have more low energy days than normal or high energy days. Only wash dishes when everything is dirty. On bad days when I ... [AR292] emotionally can't tolerate anything we don't leave the house. I try to buy enough groceries so we don't have to leave the house. Feel horrible and rotin [sic] for not taking daughter outside. When I feel like this I lay in bed, watch tv, play games on computer while my daughter is in her room playing or watching cartoons. I've been known to play Nintendo all night and forget to sleep. I go to bed anywhere from 9 PM to not at all.

She reported that she took care of her daughter's daily needs and no one helped. AR292. In response to other questions she wrote, "Since 8 years old I have had problems so hard to remember." Id. "The illnesses and injuries cause me to zone out therefore not sleeping." Id. "I often only bathe when I'm too dirty or smelly." Id.

Seay said she needed reminders to take medicine: "either someone remind me or something beeping - don't have either." AR293. She responded that she made "quick meals if it can't be made in less than 10 min it takes to

45

much energy;" she put off laundry and dishes "till I am out of clothes or dishes,

and "if I do nothing else it can take me up to 2 days to wash laundry and

because of the way I have to wash dishes so as to not be in pain the dishes

never get caught up." <u>Id</u>. She wrote, "I have to take pain meds in order to do the

laundry or stand up to wash dishes for longer than 5 min". <u>Id</u>.

Seay wrote that she went outside "only when my emotions can handle it."

AR294. She rode or drove in a car. <u>Id</u>. She stated that she could not go out

alone: "get paranoid if I'm by myself". <u>Id</u>. She stated that she shopped for

groceries, for her daughter's needs, and for car parts, and that she did so "only

as little as possible and only as needed." <u>Id</u>. She said she was able to pay bills,

count change, use a checkbook and money orders, and handle a savings

account. <u>Id</u>.

She watched tv and listened to music in the car. AR295. She chatted and

played games on Facebook with friends every day. <u>Id</u>. Asked where she went on

a regular basis, she responded, "only go to appointments or necessary places."

<u>Id</u>. In response to the question about how often she went to church,

community center, social groups, etc., she wrote, "don't go." <u>Id</u>.

To the question about problems getting along with others, she wrote,

"have a strained and dysfunctional relationship with my mom." AR296. She

wrote, "I use to do things with friends and be more social. Have problems with

trust based on past experiences." <u>Id</u>. To the question asking what abilities were

affected, she did not check any boxes and wrote, "My issues effect all of the

above but my medications make them tolerable." <u>Id</u>.

She stated that she could walk 4-5 blocks and resumed walking "when my chest quits being tight and my breathing is no longer shallow." AR296. To the question, how long can you pay attention, she wrote, "not very long get side tracked." <u>Id</u>. She said she did not finish what she started. <u>Id</u>. In response to the question how well she followed written instructions, such as a recipe, she wrote, "if I haven't done it before I follow it very well". <u>Id</u>. She wrote that she did not follow spoken instructions very well. <u>Id</u>.

She wrote that she did not get along with authority figures: "not at all recently went to jail for arguing with cops." AR297. She said she had been fired because of problems getting along with others. Id. She wrote, "have had to take more breaks than other people because I overreact to various things." <u>Id</u>. She said this happened at Walmart where she did not handle stress "at all." <u>Id</u>. She said she did not handle changes in routine "at all." <u>Id</u>. She acknowledged unusual behavior or fears "because of traumatic things that have happened in my life." <u>Id</u>.

Seay reported side-effects of medications: Cymbalta caused face sore and dry mouth; and Vicodin caused "nausea, dry mouth, itchiness". AR298.

In her reconsideration disability report on December 6, 2013, Seay reported a "new condition:" "Scoliosis found after injury to back." AR309. She reported seeing a chiropractor for "Pain in hips, back, neck, Migraines." AR310.

She reported seeing Behavior Management Systems for "Depression Anxiety, PTSD, anxiety in public places I always have problems with paperwork: I don't process information correctly, or turn things in on time. I

also have problems dealing with organizations. When I don't understand, I get anxious, then angry and burn bridges when I don't mean to." AR310-11. She reported having 1:1 counseling and case management, which "helps me decipher which is the best thing to do and what order to do them in because my head doesn't compute it right." AR311.

She reported going to Spearfish Regional Hospital on September 28, 2013:

> Back became very painful while I was cleaning. Pain was so bad that I could barely move. I could not get out of the car without much help due to pain in legs, hip and back. Hospital personnel had to help me out. Had to be transported via wheelchair. Someone else had to drive me home and help with everything for two days including caring for my daughter.

AR311-12. She reported her medications and side-effects: antibiotic for rash that is a side-effect of Cymbalta; Baclofen for tense and cramping muscles, with side-effect of sleepiness; and Cymbalta for anxiety & fibromyalgia, with side-effect of "[s]ores on face, arms, stomach, dry mouth, dizziness when standing, muscle twitching if I forget to take it." AR312. She reported taking Meloxicam for inflammation and pain. She took Vicodin for pain and fibromyalgia and had side-effects of itching, constipation. Id.

She reported, "If Fibromyalgia is flared up I'm unable to do daily tasks such lifting, cleaning, can only climb stairs very slowly, can't walk any distance." AR313.

On April 30, 2014, she completed a third disability report in which she stated, in response to the question were there new limitations,

I don't have any desire to go anywhere or do anything. The only reason I do go anywhere is because I know my daughter needs to it. I recently found out I am pregnant so I cannot take any of my medications.... I was also raped on New Years Eve 2013 which has emotionally affected me, made me even more depressed, more anxiety, and not wanting to leave my house.

AR318.

Asked how her illnesses, injuries, or conditions affected her ability to care for her personal needs, Seay wrote,

Only shower on days I have to go to appointments which means that I also stay in the same clothes and dont [sic] do anything with myself, make bare minimum of food for myself and daughter, my daughter dresses herself or else she may stay in the same clothes also.... dont [sic] leave my house, do less housework and laundry as I dont [sic] have the desire or energy.

AR321.

On January 8, 2016, Seay stated that when she worked at Walmart she was on "excessive pain killers and muscle relaxers. I was diagnosed with fibromyalgia in 2010, but I was allergic to Lyrica and had to take medications that affected my judgment." AR341. Seay also stated, "I pulled double shifts when my boys' case went all wrong and I worked in order not to deal with it. Pain helped me not deal with it. Sleep and work, that was my existence when I was going through the parental termination proceedings." AR342.

Seay's mother, Wilma Faith Goehring, completed a third-party function report. AR299. She reported seeing Seay from 2 hours a week to 4 hours a day. Id. She stated that Seay lived in apartment with her toddler daughter. Id. She stated, "When Katrina is out among people she takes on a personality that is usually acceptable to who she is associating with. But behind closed doors

49

she is worn out from a fake self." Id. Ms. Goehring stated that Seay did "[v]ery little house cleaning, migraines a lot, sleeps a lot." Id.

Ms. Goehring reported, "Her 3 story apartment is very physical for her hips to go up and down." AR300. Ms. Goehring stated that Seay took care of her daughter, i.e., cooked for her, did her laundry and bathed her, and played with her. Id. Ms. Goehring stated that she helped her daughter: "When her laundry and housework have been piling up, usually because of migraines & hip pain, I go over to help play with Zyriah and do part of the work." Id.

She stated, "Katrina has been like this since birth, but has progressively gotten worse." AR300. She stated, "Over sleeps alot. Fear of the public energy keeps her behind locked doors and sometimes keeps her awake for 48 hrs, then migraine, then sleep." Id.

 Ms. Goehring stated, regarding house and yard chores, "Katrina can do it all if she doesn't have to contemplate seeing anyone." AR301. She stated, "A chore may take her all of one day or all of two weeks, according to outside of home associations." Id.

At times she could not do chores: "Appointments with the outside of herself world, including me can cause so much emotional stress that she gets migraines and cannot do house chores." AR302. She went out "As seldom as possible" due to "Fear of a migraine caused from social stress." Id. She drove a car and could go out alone. Id. She shopped in stores and by computer for food, children's clothes and toys, and car needs. Id. She shopped at night if possible, noting that Walmart was open for 24 hours. AR303.

Ms. Goehring said Seay played Nintendo "as an addiction." AR303. She said that Seay played with her daughter often. Id. She wrote: "Progressively over her years she has become more re-clusive and has been in more pain." Id. "She doesn't go anywhere if she doesn't have to." Id.

Ms. Goehring wrote, "I am her mother. I could write a book on her social issues from 5 yrs old and on. S.S. Teachers, Foster homes, My Mom's home, social service, & police." AR304. She wrote that from age five to 15, Seay "tried to obey," that from age 13-18½ she was in foster homes, and from "18½ to now - a whole nother [sic] book". Id.

Ms. Goehring said, regarding written instructions, that "A Recipe is fine - Essay written instruction is bad. She reads too much into what is instructed". AR304. As for spoken instructions, "Not very well if she doesn't want to. Or if there are too many variables she stresses out & can't follow thru". Id.

Ms. Goehring stated that Seay did not get along well with others and "Always tries to tell authority how they are suppose [sic] to do their job including how I should be a mother to her." AR305. Also, "She reads too much into the conversation, then stress migraines and pain kick in." Id. This had happened with "All employers." Id. Ms. Goehring stated that her daughter did not handle stress well. Id. "She either calls the cops to come 'fix it' or becomes very reclusive and not even open her door to me." Id. She did not handle changes in routine "at all." Id. "She fears people, including me at times." Id.

Ms. Goehring reported, "At 17 yrs she had her 1st baby. Her physical pain in the lower back became very bad. With each pregnacy [sic] and delivery

her back pain has worsened. The many jobs she has attempted to do end negative because of pain or/and fear of others." AR306.

**F.      Testimony at Administrative Hearing**

On July 22, 2015, Seay testified that she had other evidence that she would like to submit: "some history from when I was a teenager." AR59. The ALJ told her, "that really wouldn't be probative of the time period that we're going to be talking about." Id.

The ALJ stated that she would consider the period from about May 30, 2012, to the present. AR61. She stated, "what I show for ... impairments ... is that you have a diagnosis of fibromyalgia." Id. The ALJ noted a diagnosis of migraine headaches and scoliosis. AR62. Seay testified that scoliosis caused back and hip pain. Id.

She had a driver license and a car. Her mother paid for car insurance and gas. She drove once or twice a week. AR63. She drove to therapy appointments at Behavior Management Services where she had had weekly appointments with her therapist, Shannon Howard, for two and a half years. AR 64. Seay was "not real clear" what her mental diagnosis was. Id. "Maybe PTSD, anxiety." Id.

Seay testified that she had difficulties getting primary care providers to give ongoing medication for her migraines, or "what they call chronic pain issues." AR76.

The ALJ asked, "Did anyone officially diagnose fibromyalgia...?" AR76. Seay testified, "Yes. Dr. Frost ... with the pain management clinic at the Rapid

City Hospital ... [t]he end of 2010." Id. The ALJ asked if she took medication for that, and Seay said she did not. Id.

The ALJ asked, "Are you having financial constraints getting your medication?" AR77. Seay said, "No. I'm having medical constraints getting my medication." Id. The ALJ asked what she did for her fibromyalgia pain, and Seay said she had been seeing a chiropractor for two and a half years "in combination with the initial medication and doctor that was willing to prescribe these things.... He referred me to this chiropractor which is Dr. Tony Hintgen...." Id. Seay testified in response to the ALJ's question that, for her migraines, she had tried OTC medications and they did not do much. Id. She testified that when she had no medications for migraines she went to the emergency room. Id. The ALJ asked how many times in the last couple years, and Seay was not sure and estimated "over ten." AR78.

The ALJ asked if she had trouble remembering to go to her appointments, and Seay said she did. AR78. In response to the ALJ's questions, Seay said she had anxiety sitting in a full waiting room, tension at the hearing, and that it bothered her if someone sitting next to her wanted to chat. AR79.

Seay testified that her difficulty interacting with people began in 2000 and got significantly worse the end of 2008. AR79. She did not see her baby's father anymore. AR79-80. She did not belong to any clubs or have coffee with people who lived in her apartment building. AR80. An Early Head Start teacher

came into her home once a week for her daughter "[b]ut I really don't like people in my home." Id.

Seay's mother, Wilma Goehring, testified that she saw her daughter about once a week. AR81. She said she offered to help with the children "a lot. Katrina doesn't -- she's too paranoid sometimes to let people around her, including myself." Id. Seay would ask her mother to go with her to an appointment that was stressful. AR82.

Ms. Goering testified that her daughter's "emotionally functioning happened when she was five and ... she's been in and out of foster care as a teenager I got my degree in psychology, just so I could be the best mom I could be without the guilt trip that borderline puts on you." AR83. She testified that she thought her daughter had a borderline personality disorder. Id. She stated, "She's called the police on me when I've knocked on her door before, she doesn't want me there." Id.

Ms. Goehring stated that "Shannon at Behavior Management is the best counselor that Katrina has had in all these years." AR83. "[S]he goes through caseworkers and counselors like crazy." Id. The ALJ asked about Seay's ability to mother her children and Ms. Goehring testified that she worried about the children, "Absolutely," when her daughter did not answer the phone or the door, and wondered "how much is she shutting life out that the children are not getting to experience," although she was pleased that Head Start was coming into the home. AR84-85. "I chalk that up to Shannon knowing dialectical behavior therapy." AR85.

Ms. Goehring testified that Seay had "emotional issues of being able to keep a doctor consistently." AR86. "She gets the doctors so confused in her methods of communication that doctors don't want to see her anymore.... This last pregnancy, she goes through three or four OB doctors in one pregnancy." Id. Ms. Goehring said the same thing happened with counselors and attorneys: "she goes through them like crazy is [why] she doesn't have an attorney with her here today ... because she's had lots of attorneys say we don't want to deal with you...." Id.

Ms. Goehring testified that Seay was "not a pain pill addicted person. This runs in our family. The stress of the fibromyalgia, the pain, the muscle aches, ... and then if you put any kind of emotional issue on top of it, you've really got lots of stress." AR87.

## G.    Opinion Evidence

On October 11, 2013, Kevin Whittle, M.D., DDS non-examining physician, opined a physical RFC for light work (occasionally lifting and/or carrying up to 20 pounds and frequently lifting and/or carrying up to 10 pounds, sitting, standing, and/or walking for six hours in an eight-hour workday. AR 104. Dr. Whittle stated reasons: "Limitations due to widespread chronic pain related to fibromyalgia." Id. Dr. Whittle opined postural limitations that permitted occasional climbing of ramps and stairs, ladders, ropes, and scaffolds; occasional stooping and unlimited balancing; occasional kneeling, crouching, and crawling. AR105. He opined that she had no manipulative, visual, communicative, or environmental limitations. Id.

On October 17, 2013, Eleni Muntz, Ph.D., non-examining psychologist for DDS, listed Seay's diagnoses: fibromyalgia, migraine, anxiety and affective disorders. AR102. Dr. Muntz opined "mild" restrictions in the first three "B" criteria and opined no episodes of decompensation of extended duration. Id. Dr. Muntz stated reasons: C&S Medical Clinic on October 10, 2012 noted "negative for anxiety depression and sleep disturbances." Id. Behavior Management reported that Seay was in therapy to help with various psychosocial stressors and past "trauma" and to address issues regarding her relationship with her mother. Id. She had been off her Cymbalta at one point and realized she needed to get back on it. Id. Dr. Brady said she had situational depressive disorder and anxiety and was "in no acute distress." Id. According to her function report, Seay lived with family and had no problems with personal care, simple meal preparation and simple household chores, could drive and go out alone, shop and manage finances, was sociable, could follow basic instructions and complete questionnaires. Id. She reported problems adjusting to change and coping with stressors. AR103. Her mother said Seay could read simple instructions. Id. Her mother said Seay had interpersonal problems as she "tends to tell people how they are supposed to do their job." Id. Dr. Muntz opined that with medical compliance her symptoms would be stable. Id.

On March 18, 2014, Jerry Buchkoski, Ph.D., non-examining DDS consultant, opined a PRTF and mental RFC that agreed with Dr. Muntz's. AR114-15.

On March 18, 2014, Tom Burkhart, M.D., non-examining DDS consultant, opined a physical RFC that agreed with Dr. Whittle's. AR116-17.

On January 5, 2015, Shannon Howard completed a Mental Impairment Questionnaire (stamped received by ODAR on July 16, 2015). AR964-71. Ms. Howard reported seeing Seay weekly since March 19, 2013. AR964. She reported Seay's Axis I and II diagnoses were 296.90, Mood Disorder NOS, and 301.9, Personality Disorder NOS. Id.

Ms. Howard checked signs and symptoms: Poor memory, mood disturbance, emotional lability, social withdrawal or isolation, decreased energy, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, persistent irrational fears, generalized persistent anxiety, hostility and irritability. AR 964-65. She listed other symptoms: worry, past trauma/loss, self-blame, depression, sleepless[?], difficult interpersonal relationships. AR 965.

Ms. Howard listed clinical findings: Ongoing anxiety, depression, relational issues, difficult[y] leaving house, anhedonia, irritable, lack of motivation, worry, fear. AR 965. She stated that Seay was not a malingerer. Id. Ms. Howard stated the prognosis: "Will need ongoing therapy for some time." AR966. She estimated that Seay's impairments or treatment would cause more than three absences per month. AR967.

Ms. Howard assessed Seay's ability to do unskilled work as follows: fair ability to remember work-like procedures; fair ability to understand, remember and carry out short and simple instructions, make simple work-related

decisions, and be aware of normal hazards and take appropriate precautions; poor or no ability to maintain attention for two hour segment; maintain regular attendance and be punctual within customary, usually strict, tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; accept instructions and respond appropriately to criticism; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and deal with normal work stress. AR968.

Ms. Howard provided an explanation of the limitations in the fair and poor categories: "Anxiety & depression affect focus and motivation & history of not dealing or working well w/ others." AR969. Ms. Howard added that Seay had a "history of not being able to follow through" Id. Ms. Howard assessed "poor or no" ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation. Id. Ms. Howard explained her assessment: "history of issues w/ public, unknown places & leaving house." AR970.

Ms. Howard assessed "marked" restriction of activities of daily living, "marked" difficulties maintaining social functioning, "marked" deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and "three or more" episodes of deterioration or decompensation in work or work-like settings which caused withdrawal from

the situation or exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). AR970.

Robert Pelc, Ph.D., testified at the July 22, 2015 hearing. AR68. Prior to hearing, the ALJ had sent him a letter stating that he was receiving copies of pertinent medical exhibits and a list of exhibits. AR216. He testified that he had reviewed the "F" exhibits through 22F. AR69. He identified the mental impairments that he was able to find established. The first category was affective disorder characterized in multiple ways as mood disorder NOS, dysthymic disorder, major depressive disorder, and adjustment disorder with mixed emotional features involving depression and anxiety, and situational depression. AR70. The second category was anxiety-related disorders characterized as either generalized anxiety or post-traumatic stress disorder. Id. The third category was personality disorder "not otherwise specified." AR70-71.

Dr. Pelc opined that Seay had "mild" restriction of activities of daily living; "moderate" limitation in her social functioning; "moderate" difficulties in maintaining concentration, persistence, or pace; and "zero" episodes of decompensation of extended duration. AR71. Dr. Pelc opined that she had "generally clear thinking process, but at times, distracted or disrupted by her anxiety." AR72. He opined in response to the ALJ's question that Seay was able to concentrate sufficiently to perform unskilled work that required one- to three-step instructions. AR72-73. He opined that he "would not preclude" work "in a routine work setting with people nearby and having to interact with those

people." AR73. "I would place her in an occasional to frequent range regarding interacting with the public, supervisors, and coworkers." Id.

The ALJ asked if Seay would be "emotionally labile? Would she have outbursts in an unexpected nature?" AR73. Dr. Pelc opined that, occasionally that may occur ... but I would not see it as a recurring thing." Id.

The ALJ asked Dr. Pelc to opine whether mental health limitations would preclude regular attendance at work. AR73. Dr. Pelc opined, "Not on the regular or recurring basis would I expect that to happen." AR74. Dr. Pelc opined that Seay was able to ask questions at work if she required assistance while performing simple and repetitive or routine tasks, but with more complex tasks she would have more trouble. Id. Dr. Pelc opined that she could interact with the public but not on an ongoing, frequent basis. AR75.

Barry Brown, vocational expert, opined at hearing that an individual with the RFC posed by the ALJ could work as a merchandise marker, DOT 209.587-034, and that there were 271,000 such jobs in the United States. She could also work as a router, DOT 222.587-038, with 52,000 such jobs in the United States. AR87-89. Mr. Brown opined that the individual would not be able to perform any work if she would be absent from work three times a month, could maintain attention for two hours at a time, could not work closer than ten feet from other workers, required a slow work speed, and required one extra 15-minute work break during the work day resulting from inability to respond appropriately to constructive criticism. AR89.

Mr. Brown testified that if the individual would miss work three times in a month, she could not do work. AR90.

## H.    **ALJ Decision**[39]

On August 26, 2015, ALJ Debra Denney issued a fourteen page, single-spaced written decision denying benefits.  AR28-41.

At step one, the ALJ found Ms. Seay had not engaged in substantial gainful activity since the date of her SSI application (May 30, 2013).  AR30.

At step two, the ALJ found Ms. Seay had the following severe impairments:  mental impairments variously diagnosed as affective disorder, anxiety disorder, (PTSD), and personality disorder; and physical impairments consisting of scoliosis and obesity.  AR30.

At step three, the ALJ found Ms. Seay did not have an impairment or combination of impairments that met or medically equaled a Listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR31-32.

At step four, the ALJ found Ms. Seay had the residual functional capacity to perform unskilled, limited light duty work, so long as her interactions with co-workers, supervisors and the public was not on an extended, constant basis.  AR32-40.

At step five, the ALJ found there were a significant number of jobs in the United States that Ms. Seay could perform.  AR40-41.  As such, the ALJ found that Ms. Seay was not disabled.  AR41.

---

[39] This section and the following section are not part of the parties' stipulated facts.

**I. Issues Raised by Ms. Seay in this Appeal**

Ms. Seay raises the following five issues before this court:

1.      Whether the ALJ committed reversible error when she rejected Ms. Seay's fibromyalgia, without developing the evidence based on the rationale that fibromyalgia was not "medically determinable?"

2.      Whether it was error to assign "considerable weight" to Dr. Pelc's opinions and to incorporate them into the RFC?

3.      Whether it was error to rely upon non-examining DDS consultant opinions to rebut the treating therapist's assessment, which was supported by the agency records and other evidence?

4.      Whether the ALJ applied an improper standard when assessing the credibility of statements of Ms. Seay and her mother concerning the intensity, persistence and limiting effects of her symptoms?

5.      Whether the ALJ failed to apply the statutory standard when finding that a significant number of jobs existed that matched the RFC formation?

**DISCUSSION**

**A.      Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as

adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

## B.  The Disability Determination and the Five-Step Procedure.

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 16.905.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 16.905-16-911.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential  analysis is mandatory for all SSI and SSD/DIB applications. <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 416.920.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**   Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments

significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 416.920(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 416.920a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 416.920(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.   NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 416.920a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 416.920(e); 416.945(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 416.920(f).

## C.      Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 416.912(a). The burden of proof shifts to the Commissioner at step five. Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D. Whether the ALJ Erred by Finding Ms. Seay's Fibromyalgia was not "Medically Determinable"?

Ms. Seay argues the ALJ found her fibromyalgia was *not* a medically determinable impairment because no medical records in the administrative record documented the necessary findings to support a conclusion that Ms. Seay suffered from a medically determinable impairment of fibromyalgia. Those records existed in Dr. Steven Frost's medical records for Ms. Seay, she asserts. Ms. Seay believes the ALJ should have developed the record and obtained Dr. Frost's records.

The Commissioner asserts the ALJ *did* find Ms. Seay suffered from fibromyalgia as a medically determinable impairment. The Commissioner further asserts that the ALJ had no duty to obtain Dr. Frost's records because they pertain to a time period outside of the alleged period of disability which

the ALJ was considering based on Ms. Seay's application. The parties' contrary positions require the court to first ascertain what conclusion the ALJ did in fact make regarding whether Ms. Seay's fibromyalgia was a medically determinable impairment.

### 1. The Commissioner's Guidance for Evaluating Fibromyalgia

The Commissioner has provided guidance for ALJs evaluating fibromyalgia in SSR 12-2p. Under SSR 12-2p, fibromyalgia may be analyzed using either of two sets of criteria. <u>See</u> SSR 12-2p, IIA and B. One set of criteria is based on the 1990 American College of Rheumatology (ACR) Criteria for Classification of Fibromyalgia. <u>Id.</u> at IIA. The other set of criteria is based on the 2010 ACR Preliminary Diagnostic Criteria. <u>Id.</u> at IIB.

Under the 1990 ACR standard, the Commissioner "may" find that a claimant has a medically determinable impairment (MDI) of fibromyalgia (FM) if the following criteria are met:

> 1.     A history of widespread pain in all quadrants that has persisted for at least 3 months. The pain may fluctuate in intensity and may not always be present.
>
> 2.     At least 11 of 18 specified tender points on physical examination, both above and below the waist.
>
> 3.     Other disorders that could cause the above symptoms have been excluded or ruled out.

<u>Id.</u> at IIA.

Alternatively, the Commissioner directs in SSR 12-2p that, under the 2010 ACR standard, the Commissioner "may" find that a claimant has a MDI of FM if the following criteria are met:

1. A history of widespread pain in all quadrants that has persisted for at least 3 months.  The pain may fluctuate in intensity and may not always be present (same as (1) above).

2. Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

Id. at IIB.

The actual diagnosis of fibromyalgia was made by Dr. Frost; Ms. Seay indicated to the Commissioner that the last time she saw Dr. Frost was in mid-2011.  AR287.  Her disability application was dated May 31, 2013.  AR236-47, 261.  Therefore, Dr. Frost's records concern a period of time two years before the period of disability alleged.[40]  Ms. Seay is correct in positing that the records of Dr. Frost were not before the ALJ.  Ms. Seay does not assert what Dr. Frost's records would show had they been made part of the record.

---

[40] Although Ms. Seay alleged a disability onset date of October 16, 2012, she applied for benefits on May 31, 2013.  As discussed at footnote 1, *supra,* Ms. Seay is only potentially eligible for SSI benefits, and not SSD benefits.  Because SSI benefits are not retroactive to the date of application (see SSR 83-20), the period of disability under consideration begins with the date of her application.  Nevertheless, medical records from outside the period of disability under consideration may be considered "to elucidate a medical condition during the time for which benefits might be awarded."  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  The ALJ specifically stated she considered medical records from outside the disability period.  AR28 (citing 20 C.F.R. § 416.912(d)).

## 2. The ALJ Did Not Find Ms. Seay's Fibromyalgia was a Medically Determinable Impairment, but the ALJ Incorporated Limitations from Fibromyalgia into the Physical RFC

The ALJ stated twice, quite clearly, that she found Ms. Seay's fibromyalgia was *not* a medically determinable severe impairment. AR36 ("The record does not contain evidence consisting of signs, symptoms, and laboratory findings to establish medically determinable impairments of fibromyalgia . . ."); AR37 ("the undersigned concludes the claimant does not have a medically determinable impairment of fibromyalgia.").

However, the ALJ noted that both Dr. Kevin Whittle and Dr. Tom Burkhart, state agency medical consultants, *did* opine that Ms. Seay had a medically determinable severe impairment of fibromyalgia. AR37. The ALJ then stated that she accepted the opinions of Dr. Whittle and Dr. Burkhart in arriving at Ms. Seay's physical RFC. AR37. Thus, while the ALJ felt the evidence was lacking for finding Ms. Seay's fibromyalgia to be a severe medically determinable impairment, she accepted the physical limitations Dr. Whittle and Dr. Burkart opined as to fibromyalgia in arriving at the physical RFC in Ms. Seay's case. Id. The ALJ specifically noted that there was an absence of any opinion from a treating or examining physician indicating Ms. Seay's physical RFC was more limited than what Drs. Whittle and Burkhart had opined.

### 3. The ALJ Did Not Err in Failing to Obtain Dr. Frost's Records

The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ possess no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

However, this is true only for "crucial" issues. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). A claimant must show that the ALJ's failure to fully develop the record resulted in prejudice to her before remand will be warranted. Id. Where the failure to develop concerns a "central and potentially dispositive issue" which the ALJ failed to explore, remand is required. Snead, 360 F.3d at 839. But the ALJ's "duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy, 648 F.3d at 612.

Here, crucially, the ALJ accepted the only opinions in the record concerning Ms. Seay's physical RFC—the opinions of Drs. Whittle and Burkhart—and both physicians found Ms. Seay had a severe medically determinable impairment of fibromyalgia and accordingly attributed physical limitations to that condition. AR36-37, 97-119. No other treating or examining physician opined as to Ms. Seay's physical RFC.

There is nothing in the record to suppose that Dr. Frost's records, had they been obtained, would have contradicted the opinions of Drs. Whittle and Burkhart. All three physicians apparently agreed Ms. Seay suffered from fibromyalgia. Ms. Seay never asserts that Dr. Frost's records would have contained a different assessment of her physical functioning as a result of fibromyalgia. In any event, since fibromyalgia symptoms wax and wane (see SSR 12-2p), and since Dr. Frost's records reflect Ms. Seay's physical wellbeing at a time well outside the disability period under consideration, Dr. Frost's records would have been of limited evidentiary value.

The court notes Ms. Seay herself never described significant physical limitations as a result of her fibromyalgia. She stated she could only walk 4-5 blocks before needing to rest, but that was because of shortness of breath. AR296. She stated she could perform all manner of physical and postural acts when she takes her medications. Id. She did say she has to take a pain pill if she is going to do laundry or dishes. AR293. She described an acute back pain incident in September, 2013, that occurred after she had been cleaning, but this, too, was never attributed to fibromyalgia. AR312.

In a December 6, 2013, disability report, she stated if her fibromyalgia flared up, she was unable to do daily tasks such as lifting, cleaning, and walking for any distance.  AR313.  At such times she could climb stairs very slowly.  Id.  She did not report how often her fibromyalgia flares or how long a flare lasts when it does occur.  Id.

In her hearing testimony, Ms. Seay described hip and back pain from scoliosis, but no pain or functional limitations from fibromyalgia.  AR62.  She described limitations from heavy lifting, but that was due to pregnancy, not fibromyalgia.  AR67.

Ms. Seay's mother, Wilma Goehring, also said very little about physical pain or fibromyalgia.  In her third-party function report, she reported the problem with Ms. Seay's hips (described as "too open") made it difficult for Ms. Seay to go up and down stairs.  AR300.  Ms. Goehring stated this hip problem got worse with the birth of each of Ms. Seay's children.  AR306.  The focus of this third-party statement, like Ms. Seay's statements themselves, was on Ms. Seay's mental impairments. AR299-306.  Fibromyalgia was not mentioned by Ms. Goehring.  Id.  Likewise, the focus of Ms. Goehring's hearing testimony was on Ms. Seay's mental impairments.  AR81-87.  Although fibromyalgia was mentioned, it was only in passing, it was described as a family trait, and it was linked to Ms. Seay's emotional issues.  AR87.

The court concludes that remand is not warranted on this issue.  Although the ALJ found Ms. Seay did not suffer from a medically determinable impairment of fibromyalgia, the ALJ gave Ms. Seay the benefit of the doubt and

arrived at her physical RFC by incorporating the opinions of doctors favorable to Ms. Seay on this issue. This is not a case where the ALJ failed to develop the record as to a central and potentially dispositive issue, as in <u>Snead</u>. All of Ms. Seay's own statements show that her mental impairments were the main focus of her inability to work. Fibromyalgia was a lesser issue and the missing medical records are outside the period of disability.

This is a case where the ALJ saw the evidence differently than the consulting doctors, but gave the benefit of the doubt to the claimant and credited the only medical opinions in the record concerning the effect of fibromyalgia on Ms. Seay's functioning. Those opinions happened to be favorable to Ms. Seay on the issue of whether her fibromyalgia was a severe medically determinable impairment. Accordingly the court concludes there was no prejudice to Ms. Seay arising from the ALJ's failure to request Dr. Frost's medical records from 2010 and 2011.

Ms. Seay states that if the court remands with instructions to the ALJ to obtain Dr. Frost's records, the court should also instruct the ALJ to develop the record regarding Ms. Seay's cavum septum pellucidum condition. <u>See</u> Docket No. 19 at p. 17. Ms. Seay literally does not discuss the issue further. <u>Id.</u> She does not provide factual or legal support for her request. <u>Id.</u> Since the court has concluded it will not reverse on the fibromyalgia issue, and since Ms. Seay does not support her request for remand on the cavum septum pellucidum issue, the court declines the invitation to remand on this ground.

**E.      Whether the ALJ Erred by Assigning Considerable Weight to
Dr. Pelc's Opinions?**

Medical opinions are evidence which the ALJ will consider in determining

whether a claimant is disabled, the extent of the disability, and the claimant's

RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according

to the same criteria, namely:

> --whether the opinion is consistent with other evidence in
> the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined
> the claimant;
>
> --whether the person giving the medical opinion treated the
> claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence,
> especially medical signs and laboratory findings;
>
> --the degree to which a nonexamining or nontreating
> physician provides supporting explanations for their
> opinions and the degree to which these opinions
> consider all the pertinent evidence about the claim;
>
> --whether the opinion is rendered by a specialist about
> medical issues related to his or her area of specialty;
> and
>
> --whether any other factors exist to support or contradict the
> opinion.

See 20 C.F.R. § 416.927(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir.

2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 416.927(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 416.927(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole,

especially when they are contradicted by the treating physician's medical opinion. Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a non-treating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue 513 F.3d 788, 792 (8th Cir. 2008)(citing Casey, 503 F.3d 687, 691-692 (8th Cir. 2007)). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

In this case, as discussed in the FACTS section above, the ALJ considered and assigned weight to six medical sources. Those medical sources and the weight assigned their opinions are summarized here:

- *Kevin Whittle, M.D.* and *Tom Burkhart, M.D.* (non-treating, non-examining State Agency medical consultants who reviewed the evidence at the initial and reconsideration levels of adjudication, respectively on October 11, 2013, and March 18, 2014. Drs. Whittle and Burkhart evaluated Ms. Seay's physical impairments, and concluded that Ms. Seay had a medically determinable severe impairment of fibromyalgia, and that she was capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently, standing/walking 6 hours out of an 8 hour workday, sitting 6 hours out of an 8 hour work day, and was unlimited in pushing and pulling. They further opined Ms. Seay had the following postural limitations: occasional climbing of ramps and stairs, occasional climbing ropes, ladders, and scaffolds, unlimited balance, occasional stooping, kneeling, crouching, and crawling. In other words,

these State Agency physicians assigned a modified light-duty physical residual functional capacity.

As to these opinions, the ALJ indicated she did not agree with their conclusion that Ms. Seay had the medically determinable impairment of fibromyalgia. The ALJ concluded, however, that considering Ms. Seay's other medically determinable impairments (obesity and scoliosis), and because Ms. Seay's treating physicians did not disagree with the State Agency physicians' opinions regarding her physical abilities, the ALJ would "*accept*" the State Agency physicians' opinions regarding Ms. Seay's physical residual functional capacity.

- *Shannon Howard, M.A., LPC.* Ms. Howard was Ms. Seay's weekly counselor at Behavior Management Systems from early 2013 forward. Ms. Howard completed a Mental Impairment Questionnaire on January 5, 2015. Ms. Howard indicated Ms. Seay had mental diagnoses of 296.90 (mood disorder) and 301.9 (personality disorder) with a current and past one-year GAF of 57. Ms. Howard opined Ms. Seay's limitations would cause Ms. Seay to be absent from work more than three times per month and that Ms. Seay had fair, poor, or no ability to perform unskilled work activities, fair, poor, or no ability to interact appropriately with the general public and to maintain socially appropriate behavior. Ms. Howard also opined that Ms. Seay was unable to work 8 hours per day, 5 days per week and that Ms. Seay had "marked" limitations in activities of daily living, "marked" limitations in maintaining social functioning, and "marked" limitations in concentration, persistence and pace. Finally, Ms. Howard opined Ms. Seay has experienced "repeated" episodes of decompensation.

  As to this medical opinion, the ALJ noted Ms. Howard "is a non-acceptable medical source under the regulations( 20 C.F.R. 404.1502) but nonetheless gives her opinion some weight, as she is a therapist and has a treating relationship with the claimant." The ALJ further qualified this statement, however, by stating Ms. Seay's own description of her symptoms and the therapy notes and records did not support the severity of the limitations assessed in Ms. Howard's opinion. The ALJ further characterized Ms. Howard's opinion as "markedly inconsistent" with other substantial evidence in the record, including the State Agency consultants and the medical expert (Dr. Pelc), who were acceptable medical sources and whose opinions suggested Ms. Seay had much greater functional capacity.

- *Eleni Muntz, Ph.D.* and *Jerry Buchkosksi, Ph.D.* (non-treating, non-examining State Agency psychological consultants who reviewed the evidence at the initial and reconsideration levels on October 17, 2013,

and March 18, 2014, respectively).  These two consultants reviewed Ms. Seay's records (not including records received into the record after the date of Ms. Seay's request for a hearing, which was filed on April 24, 2014) and determined she had medically determinable anxiety and affective disorders, but they opined those conditions imposed no more than "mild" limitations on the "paragraph B" criteria and were therefore non-severe.

The ALJ assigned these opinions "some weight, but less weight than the opinion of the medical expert [Dr. Pelc] who reviewed all the evidence, including additional records received since the request for hearing."

- *Robert Pelc, Ph. D.* (non-treating, non-examining medical consultant who testified telephonically at the ALJ hearing on July 22, 2015).  Dr. Pelc reviewed the "F" exhibits (the medical records).[41]  He testified that the evidence established Ms. Seay had the following diagnoses:  Affective disorders (characterized in Listing 12.04 as mood disorder, NOS, dysthymic disorder, major depressive disorder, and adjustment disorder with mixed emotional features involving depression and anxiety, or as situational depression).  Ms. Seay also had a diagnosis of anxiety disorder under Listing 12.06 (characterized as an anxiety disorder, NOS, generalized anxiety, disorder, or PTSD).  Finally, Dr. Pelc opined Ms. Seay also had a diagnosis of personality disorder, NOS, under Listing 12.08.  Relative to the "B" criteria, Dr. Pelc opined Ms. Seay had "mild" deficits in activities of daily living, "moderate" degree of limitation in social functioning, and "moderate" difficulties in maintaining concentration, persistence and pace.  Dr. Pelc did not believe Ms. Seay had any episodes of decompensation.  He did not believe that any of her mental impairments met or equaled a Listing.

The ALJ assigned Dr. Pelc's opinion "considerable weight (20 C.F.R. 404.1527) and indeed greater weight than the opinions of the State Agency psychological consultants, in reaching a conclusion of mental residual functional capacity because Dr. Pelc had the opportunity to review all the records.  Further, he is an expert in evaluating mental disorders and the evidence upon which he relied supports his opinion."

---

[41] The court notes that during his testimony, Dr. Pelc indicated he had reviewed the "entire file-- AR69--" but referred only to the medical records and the "F" exhibits.  Additionally, the letter which the ALJ sent to Dr. Pelc enclosing materials for Dr. Pelc's review, discussed above, only referred to the "medical exhibits."  AR216.  The government does not contest Ms. Seay's assertion that Dr. Pelc reviewed only the medical records (the "F" exhibits) in preparation for offering his testimony during the ALJ hearing.

Ms. Seay asserts the ALJ's assignment of "great weight" (or any weight) to Dr. Pelc's opinion constitutes reversible error because Dr. Pelc, in forming his opinion, considered medical evidence *alone*, which is contrary to Social Security regulation. The regulation to which Ms. Seay refers is 20 C.F.R. § 416.920a, pertaining to the assessment of mental disorders.

The Commissioner concedes the fact that Dr. Pelc failed to review *all* the evidence that may be considered in determining what weight the ALJ should accord his PRTF opinion. The Commissioner argues 20 C.F.R. § 416.920a requires the ALJ, not the state agency doctor, to consider all of the evidence, including the exhibit "E" evidence.[42] Here, the Commissioner argues, it does not matter that *Dr. Pelc* did not consider all the evidence because the *ALJ* properly considered all the evidence.

In brief, the Commissioner also argues the ALJ properly weighed Dr. Pelc's opinion because Dr. Pelc formed his opinion after "considering all the objective medical evidence and *listening to Seay's hearing* testimony." The court rejects outright the proposition that Dr. Pelc listened to Ms. Seay's hearing testimony. Dr. Pelc testified at the ALJ hearing telephonically. The transcript clearly shows the ALJ did not telephonically connect Dr. Pelc into the conversation at the hearing until *after* Ms. Seay had testified. See AR68. And, the ALJ disconnected Dr. Pelc immediately after Dr. Pelc finished

---

[42] The court notes that the disability file exhibit "E" evidence consists of disability worksheets, disability reports, function reports, 3rd party function reports, work background information, medication lists, and claimant statements.

testifying, and before the ALJ resumed questioning Ms. Seay and before Ms. Goehring (Ms. Seay's mother) began her testimony. AR75. (ALJ resumed questioning Ms. Seay at AR75, Ms. Goehring began testifying at AR80). Before she began questioning Dr. Pelc, the ALJ did not summarize Ms. Seay's testimony for Dr. Pelc's benefit. AR68.

Not to be deterred, the Commissioner argues that all the same information Ms. Seay expressed during the hearing she also expressed to her physicians, so this same information could also have been gleaned by Dr. Pelc from simply reading the medical records.

Are medical experts hired by the Commissioner to render opinions as to the PRTF or mental RFC required to review the claimant's testimony, read their disability and function reports and the third party reports contained within the administrative record? Section 404.920a uses the pronoun "we" and promises that "we" will consider "all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation." 20 C.F.R. § 404.920a(c)(1). "We," "our," and "us" are defined as "the Social Security Administration" ("SSA"). 20 C.F.R. § 404.102.

The SSA has a Hearings, Appeals, and Litigation Law Manual (HALLEX) that provides guidance to its employees and agents. It is not binding on either this court or on the SSA. Schweiker v. Hansen, 450 U.S. 785, 789 (1981). But the agency's own interpretation of the statutes and regulations it regularly implements has some persuasive authority. Draper v. Colvin, 779 F.3d 556, 560-61 (8th Cir. 2015) (according deference to the SSA's interpretation of

statute due to thoroughness of agency's consideration, validity of its reasoning, consistency, formality, and expertise). The Social Security Act is "among the most intricate ever drafted by Congress." Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981). Therefore, even though the SSA's policy and procedure manual does not have the binding effect of law, it is nevertheless persuasive. Draper, 779 F.3d at 561 (citing Davis v. Sec'y of Health & Human Servs., 867 F.2d 336, 340 (6th Cir. 1989)).

The HALLEX provides guidance to ALJs who procure the opinions of medical experts. In doing so, the "ALJ must make every effort to obtain *all* essential documentary evidence early enough to allow the ME [medical expert] . . . sufficient time to consider the evidence before he or she responds to questions at a hearing." HALLEX at I-2-5-30A (emphasis added). The HALLEX further directs that an "ALJ will provide an ME with *any* relevant evidence that the ME will need to formulate and provide an opinion." Id. at I-2-5-38B3 (emphasis added). The ME is not required to attend the entire hearing and listen to the claimant's testimony. Id. at I-2-6-70B. However, if the ME is not present to hear the claimant's testimony, the ALJ must summarize that testimony for the ME on the record. Id. The ALJ also must "verify the ME has examined *all* medical *and other relevant evidence* of record; . . ." Id. (emphasis added). If an ME only needed to review medical records alone, it seems counterintuitive that the Commissioner would direct its employees to make sure other relevant evidence was also placed before the ME.

These quoted provisions of the HALLEX pertain to all expert testimony from an ME on any subject; it is not limited to testimony regarding mental impairments. So in interpreting what constitutes "all relevant evidence" aside from medical evidence, § 416.920a comes into play. That provision, as well as listings 12.00C through 12.00G, make clear that in determining the impact on functioning as a result of a claimant's mental impairments, the entire longitudinal record must be considered. 20 C.F.R. § 416.920a(c)(1). That record includes consideration of whether the claimant lives in a highly structured setting so as to alleviate stress and minimize symptoms. See 20 C.F.R. Part 404 Subpart P App. 1, § 12.04 (depressive, bipolar and related disorders); 12.06 (anxiety and obsessive-compulsive disorders).

Further support for this interpretation can be found within the text of § 416.920a itself. Part (e)(5) of that section provides in pertinent part:

> If the [ALJ] requires the services of a medical expert to assist in applying the [psychiatric review] technique but such services are unavailable, the [ALJ] may return the case to the State agency or the appropriate Federal component. . . for completion of the standard [PRTF]. If, *after reviewing the case file* and completing the [PTRF], the State agency or Federal component concludes that a determination favorable to you is warranted . . .

See 20 C.F.R. § 416.920a(e)(5) (emphasis added). This provision clearly requires that when a state agency ME completes the PRTF, it must review the entire case file, not just the medical evidence within the file.

Based on a review of all the pertinent regulations and the Commissioner's persuasive interpretation of those regulations, the court concludes that, at a minimum, a state agency ME must review all *medical*

82

evidence.  Further, when assessing the functional impact of mental impairments, "all relevant evidence" includes consideration by the ME of the claimant's own testimony as to the effects and limitations imposed by their mental impairment.  Were it otherwise, the Commissioner would not require the ME to either hear the claimant's testimony at the hearing or to have the ALJ summarize that testimony for the ME.  Were it otherwise, the Commissioner also would not require state agency MEs to review the entire case file in arriving at the PRTF.

    In this case, both Ms. Seay and her mother, Wilma Goehring, testified at the hearing regarding Ms. Seay's extreme anxiety and deterioration in social and/or stressful settings.  Both women also completed written function reports detailing Ms. Seay's functioning.  The information contained within their oral testimony at the hearing and within their written reports is detailed below in section G of this DISCUSSION portion of this opinion.  Suffice it to say that both women consistently reported that Ms. Seay did not function well in public, did not get along well with other people, and that her mental issues prevented her from holding a job or forming lasting or meaningful personal relationships.  That she had never held a job for very long, and never earned very much money is certainly borne out by the objective evidence.  See e.g. AR248-252 (earnings history); AR325-26 (work history report).  This is the type of information that is not necessarily discernable by a non-treating, non-examining medical consultant solely from reading a cold medical record.  Especially in this case where, during the relevant time frame, it does not

appear Ms. Seay was employed at all, so she was not specifically talking to her medical providers about the effect that the stress of normal, everyday workplace issues would have upon her functionality.

There may be a case where a claimant's physician allows their patient the in-office time to describe the effects of her mental impairments in exquisite detail, and the physician in turn dictates into the medical record the claimant's description with the same exquisite detail. In such a case, assuming it exists, review of medical records alone might suffice in order to form an expert opinion. But this court has rarely seen such detailed medical records in the administrative record of a Social Security appeal. Where a clear, full picture of the impact of one's mental impairment upon functioning is *not* recorded in medical records, an ME must be given access to "other relevant evidence" that includes such descriptions. This may be disability and function reports submitted by the claimant or the claimant's hearing testimony, or all three. The court does not declare that an ME must specifically review all "Exhibit E" materials prior to opining about PRTF or mental RFC, only that the representative information must reach the ME in some form.

In this case, it did not. Ms. Seay's mother emphatically stated during her hearing testimony and in her written statement that Ms. Seay went through physicians and therapists "like crazy" (AR83, 86) because Ms. Seay drove even those professional people who were trying to help her in her life away. Ms. Goehring credited Shannon Howard as the best therapist Ms. Seay ever had. AR83.

As summarized above in the FACTS section of this opinion, Shannon Howard's counseling records delve into Ms. Seay's inability to handle the stress of even everyday ordinary problems, to recognize and deal with problems before they become emergencies, her inability to maintain lasting relationships, and/or her motivation for entering into serial brief intimate relationships having had their genesis in online introductions. Even Ms. Howard's records, however, did not mention that Ms. Seay's brief periods of successful employment were apparently made possible only by extreme accommodation from her employer—a fact not relevant to Ms. Howard until she was specifically asked, because Ms. Seay was unemployed during the time she counseled with Ms. Howard. That missing piece of the puzzle came from Ms. Seay's testimony (AR65-67), and from her written statement in the administrative record (AR341-42).

Here, the ALJ gave "great weight" to Dr. Pelc's opinion, "some weight" to the opinions of the non-treating, non-examining State Agency psychologists, and "little weight" to Ms. Seay's treating counselor, Shannon Howard. He also "accepted" the opinions of the State Agency consulting physicians who rendered opinions regarding Ms. Seay's physical functional capacity. Substantial evidence does not support the ALJ's conclusion that Dr. Pelc's opinion is entitled to the "great weight" it was given by the ALJ because Dr. Pelc was a non-treating non-examining ME, he did not review the "Exhibit E" materials, nor did he hear Ms. Seay's testimony, or that of her mother, Wilma Goehring, who also testified at the hearing. Additionally, there is no

85

evidence that this information was provided to Dr. Pelc in summary form by the ALJ. On remand, the consulting physician should consider "all relevant evidence" as required by 20 C.F.R. § 416.920a(c)(1).

## F. Whether the ALJ Erred in Evaluating the Weight Given to the Treating Therapist's Opinion?

Next, Ms. Seay asserts the ALJ erred by assigning only "some weight" to the opinion of her treating counselor, Shannon Howard. The ALJ noted that even though Ms. Howard was a treating provider, she was not an "acceptable medical source" under the regulations (20 C.F.R. § 416.902). That regulation provides that licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, qualified speech pathologists, licensed audiologists, licensed advanced practice registered nurses, and licensed physician's assistants are "acceptable medical sources." Id. Only "acceptable medical sources" are qualified to provide the evidence necessary to establish the *existence* of a medically determinable impairment. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). Likewise, only "acceptable medical sources" can provide medical opinions or be considered a treating source. Id.

According to 20 C.F.R. § 416.913(d)(1) as it existed on the date of the ALJ's decision,[43] however, as Ms. Seay's therapist Ms. Howard would have been

_____

[43] The regulations have since been amended and reorganized. The 2017 versions of § 416.913 and § 416.927 (regarding sources of medical evidence and the weight to be assigned to medical opinions) have been rewritten. However, as with regulation SSR 96-7p, discussed below in footnote 44, (now SSR 16-3 regarding "credibility") the rewritten versions indicate they are only applicable to claims filed prospectively after the change. In the case of § 416.913 and § 416.927 the changes are applicable only to claims filed after March 27, 2017.

an "other source" whose opinion the ALJ could have considered to determine the *severity* of Ms. Seay's impairments, and to determine how such impairments affected her Ms. Seay's ability to work.

In her brief, Ms. Seay refers to SSR 06-03p. That Social Security Ruling has likewise been rescinded effective March 27, 2017. It was, however, in effect as of the day Ms. Seay filed her application for SSI benefits (June 30, 2013) and as of the day the ALJ issued her decision (August 26, 2015). It appears that the language of SSR 06-03p, or substantially similar language, has been incorporated into the new version of 20 C.F.R. § 416.927(f), which appears in the 2017 version of the CFR.

That provision (20 C.F.R. § 416.927(f)), is applicable only to claims filed *before* March 27, 2017. The result is the same—SSR 06-03p and 20 C.F.R. § 416.927(f) both apply to Ms. Seay's case. The court takes a moment, however, to observe that as to claims filed after March 27, 2017, the CFRs regarding acceptable medical sources, medical opinions, and how the SSA must articulate the manner in which it evaluates the medical evidence, has been completely re-written.

For example, for claims filed after March 27, 2017, though a provider must still be an acceptable medical source to provide an opinion about the *existence* of a medical impairment, *all* medical sources may provide medical opinions on other issues.[44] The SSA, however, will not be required to articulate

---

[44] See https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html

any particular weight (including controlling weight) assigned to the medical

opinions in the file. Instead, the ALJ will consider the "persuasiveness" of all

medical opinions (not only the acceptable medical source opinions) using the

factors specified in the regulations. Supportability and consistency will be the

most important factors, and usually the only factors the ALJ is required to

articulate.[45]

Additionally, three new types of medical providers (advanced practice

registered nurses, audiologists, and physician assistants) were added to the list

of acceptable medical sources.[46] The Social Security Administration has

explained all these changes were made, in part, to

> reflect modern healthcare delivery and to address adjudicative
> issues resulting from the current rules. First, the final rules reflect
> that individuals now often choose to receive evaluation,
> examination, and treatment from multiple medical sources, some
> of which may not be AMSs. Second, the current policies that focus
> upon weight, including the treating source rule, have resulted in
> reviewing courts focusing more on whether we sufficiently
> articulated the weight we gave opinions rather than on whether
> substantial evidence supports the Commissioner's final decision . .

See https://www.ssa.gov/disability/professionals/bluebook/revisions-

rules.html (accessed March 26, 2018).

Returning to the weight the ALJ assigned to Ms. Howard's opinion, the

court refers to Ms. Howard's mental impairment questionnaire, dated January

5, 2015. AR964-71. First, Ms. Howard indicated that she saw Ms. Seay

"weekly" from March 19, 2013, to the "present." AR964. Because Ms. Howard

---

[45] Id.

[46] Id.

was not an acceptable medical source, she was not allowed to *establish* the presence or identity of Ms. Seay's mental impairment(s). Ms. Howard's opinion about the mental impairments from which Ms. Seay suffered, however, was the same as the opinions accepted as credible by the ALJ. Specifically, Ms. Howard opined that Ms. Seay suffered from 296.90 and 301.9 (mood disorder and personality disorder).[47] The State Agency psychological experts (Drs. Muntz and Buchkoski) and the medical consultant (Dr. Pelc) agreed with these diagnoses. Under 20 C.F.R. § 416.913(d)(1) and SSR 06-03p, then, Ms. Howard *is* qualified to opine about the severity of Ms. Seay's undisputed medical impairments, and how those impairments affected Ms. Seay's ability to work. Sloan, 499 F.3d at 888; Shontos, 328 F.3d at 426.

Ms. Howard was asked to identify the signs and symptoms exhibited by Ms. Seay which were associated with her diagnoses. Ms. Howard identified the following: poor memory, mood disturbance, emotional lability, social withdrawal or isolation, decreased energy, anhedonia[48] or pervasive loss of

---

[47] See http://www.icd9data.com/2015/Volume1/290-319/295-299/296/296.90.htm; http://www.icd9data.com/2014/Volume1/290-319/300-316/301/301.9.htm (accessed March 26, 2018).

[48] People who experience anhedonia have lost interest in activities they used to enjoy and have a decreased ability to feel pleasure. Anhedonia is a core symptom of major depressive disorder, but it can also be a symptom of other mental health disorders. Symptoms include social withdrawal, a lack of relationships or withdrawal from relationships, negative feelings toward yourself or others, reduced emotional abilities, difficulty adjusting to social situations, a tendency toward showing fake emotions, such as pretending to be happy. See https://www.healthline.com/health/depression/anhedonia#symptoms (accessed March 26, 2018).

interest, feelings of guilt or worthlessness, difficulty thinking or concentrating, persistent irrational fears, generalized persistent anxiety, hostility and irritability.  AR964-65. Ms. Howard described Ms. Seay's other symptoms as well:  "worry, past trauma, loss, self-blame, depression, sleep loss, difficult interpersonal relationships."  AR965.  Under clinical findings, Ms. Howard wrote "ongoing anxiety, depression & emotional issues, difficult leaving house, anhedonia, irritable, lack of motivation, worry, fear."  Id.

Asked specifically if Ms. Seay was a malingerer, Ms. Howard circled "no." Asked specifically if Ms. Seay's impairments were reasonably consistent with the symptoms and functional limitations described in her evaluation, Ms. Howard circled "yes."  Id.  Ms. Howard described her treatment, and Ms. Seay's response to the treatment, as follows:  "Individual therapy weekly. Has built solid relationship w/counselor, established trust, open to challenge & feedback & worked hard at this."  AR965.  As her counselor, Ms. Howard was unaware of Ms.  Seay's medications or their side effects. AR965.  As for Ms. Seay's prognosis, Ms. Howard believed Ms. Seay would need "ongoing therapy for some time."  AR966.  She believed Ms. Seay's condition had lasted and could be expected to continue for at least 12 months.  Id.  She expected Ms. Seay's condition would cause Ms. Seay to be absent from work more than three times per month.  AR967.

Ms. Howard rated Ms. Seay's ability to perform unskilled work as limited by her anxiety and depression.  She explained that Ms. Seay's anxiety and

depression affected her ability to focus and her motivation, and that Ms. Seay had a history of an inability to deal with or work well with others.  AR969.

As a result of these impairments, Ms. Howard rated Ms. Seay's ability to make simple work-related decisions, ask simple questions or ask for assistance, and be aware of hazards/take precautions as "good."

She rated Ms. Seay's ability to remember work procedures, understand and remember short instructions, and carry out short and simple instructions as "fair."  AR968.

She rated Ms. Seay's ability to maintain attention for a two-hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and deal with normal work stress all as "poor."  AR968.

Ms. Howard indicated Ms. Seay had "none" or "poor" mental abilities to deal with the stress of skilled or semi-skilled work or to set realistic goals or make plans independently of others.  AR969.  In support of this opinion,

Ms. Howard explained that Ms. Seay had a history of not being able to follow through. Id.

Next, Ms. Howard opined that Ms. Seay had "good" ability to adhere to basic standards of neatness and cleanliness, but "poor or none" ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation. AR969. As to these limitations, Ms. Howard explained Ms. Seay had a history of issues in public if the place was unknown, and of leaving her house. AR970.

Finally, Ms. Howard opined Ms. Seay had "marked" degrees of limitation in her activities of daily living, "marked" deficiencies in concentration, persistence or pace, resulting in her failing to complete tasks in a timely manner, in a work setting or elsewhere, "marked" difficulties in maintaining social functioning, and "repeated" episodes of deterioration or decompensation in work or work-like settings which had caused her to withdraw from that setting or which had caused an exacerbation of her symptoms. AR970.

The reasoning the ALJ offered for assigning only "some weight" was that Ms. Seay's own description of her functioning, the therapy notes, and the other medical records "as described above" (referring to the ALJ's written decision) did not support the severity of the assessed limitations. AR38. Furthermore, the ALJ stated, Ms. Howard's opinion was markedly inconsistent with "other substantial evidence" which the ALJ described as the State Agency psychological consultants (Drs. Buchkoski and Muntz) and the medical expert (Dr. Pelc)—all of whom were acceptable medical sources and whose opinions

92

suggested Ms. Seay had much greater capacity to function independently, appropriately, and effectively on a sustained basis.  AR38.

Returning to SSR 06-03p, that Ruling instructs that "other" medical sources such as therapists like Ms. Howard may give evidence to show the severity of a person's impairment and how it affects the person's ability to function.  Id. at p. 5-6.  The SSR explains that while the regulations explicitly provide criteria for evaluating medical opinions from acceptable medical sources, they do not explicitly address how to consider relevant opinions from "other" medical sources, such as therapists.  Id. at p. 7.

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  ***Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.***

Id. at p. 8 (emphasis added).

The ruling explains that the same factors which apply to "acceptable medical sources" can be applied to "other sources."  Id. at p. 10.  In other words, how long the source has known the claimant and how frequently the source has seen the claimant; how consistent the opinion is with the other evidence; the degree to which the source presents relevant evidence to support the opinion; how well the source explains her opinion; whether the source has a specialty or area of expertise related to the claimant's impairments; and any

other factors tending to support or refute the opinion.  Id. at p. 10.  The ruling goes on to address--in particular--opinions from medical sources who are not "acceptable medical sources."  These medical sources may address some of the same issues as acceptable medical sources, including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment, and physical and mental restrictions.  Id. at pp. 10-11.  The Social Security Administration further explained:

> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.
>
> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals." ***However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source.*** For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

Id. at p. 11 (emphasis added).

Ms. Seay asserts the ALJ erred in rejecting Ms. Howard's opinion because there was not substantial evidence in the record which was inconsistent with Ms. Howard's opinion. The ALJ cited as such evidence "the State Agency psychological consultants and [Dr. Pelc]." Ms. Seay asserts the State Agency psychological experts opinions were not substantial evidence because they never treated or even examined her, and, as the ALJ acknowledged, they only reviewed incomplete medical records (up until the date of Ms. Seay's request for hearing). Ms. Seay asserts (and this court agrees) Dr. Pelc's opinion was not substantial evidence for the reasons addressed in DISCUSSION Section E, above.

The Commissioner does not dispute that ordinarily, the opinion of a non-treating, non-examining physician does not constitute substantial evidence upon which to base a claimant's residual functional capacity finding. Wagner, 499 F.3d at 849; Harvey, 368 F.3d at 1016 (citing Jenkins, 196 F.3d at 925)). The Commissioner asserts that nevertheless, in this instance, the opinions of the non-treating, non-examining State Agency physicians and the opinion of Dr. Pelc are more consistent with the remainder of the record evidence.

Likewise, the Commissioner asserts that opinions from non-acceptable medical sources can never be accorded "controlling weight." Whatever "controlling weight" means, it does not mean that after weighing all the evidence and the appropriate factors, the ALJ may *never* adopt the well-supported opinion of a non-acceptable medical source in the face of disagreement in the record by not-so-well supported opinions of acceptable

95

medical sources—at least as to the issue of the severity of the claimant's impairment and how it affects the claimant's ability to function. As to these issues, the Social Security Administration has explicitly instructed that a non-acceptable medical source opinion may "outweigh" an opinion from an acceptable medical source. SSR 06-03p, pp. 11-12.

The next reason the ALJ cited for giving "little weight" to Ms. Howard's assessment was that it was inconsistent with Ms. Seay's own description of her level of functioning. In support of that justification, the ALJ cited Ms. Seay's activities of daily living (taking care of her daughter, preparing meals, laundry, dishes, driving, shopping, handling her finances, playing video games, listening to music, watching TV, checking Facebook, and attending her medical appointments). Ms. Seay's description of these activities, however, was in fact consistent with what was described in Ms. Howard's medical source statement. Though she described herself as capable of these activities of daily living, Ms. Seay's description of functioning in this area was far from normal. She washed dishes and clothes only when there were no clean ones left. She often bathed only when she began to stink. She felt guilty ("horrible and rotin") for not taking her child outside to the park. Though she went grocery shopping, when she did she tried to buy enough so she would not have to leave the house again soon. She did not like to leave the house alone because of her paranoia.

Ms. Seay's self -description in other facets of her life was also consistent with Ms. Howard's medical source statement. Ms. Seay reported she did not get along well with authority figures—but yet she resorted to calling to police to

come resolve her conflicts with others.  She did not trust people, had relationship conflicts, and was susceptible to stress headaches as a result. She quickly entered into relationships with men, but the relationships never lasted.  She reported  excessive worry and irritability.  She reported having worked at over 20 jobs but being fired from nearly all of them because of her inability to get along with supervisors and co-workers.  Most, if not all, of these self-reported traits were endorsed by Ms. Seay's mother—both in Ms. Goehring's written statement and in her oral testimony at hearing.  <u>See</u> summary of the same in the DISCUSSION Section G.2.b, below.

The Commissioner further asserts that the severity of the symptoms and functional abilities portrayed in Ms. Howard's medical source statement is inconsistent with her own and other medical records.  In support of that assertion, the Commissioner cites several medical records in which Ms. Seay's mood is reported as "pleasant."  AR483, 485, 489, 493, 495, 497, 499.  On these occasions, her therapist indeed recorded her mood as "pleasant."  A sample first sentence from one of these records is, "Katrina is in a pleasant mood today however had a great deal of recent stresses to talk about."  AR483. Ms. Seay continued to report ongoing stresses, and her counseling sessions focused on such subjects as appropriate boundaries for building normal friendship and family relationships, her personality disorder, paranoia, and beginning to understand how to make better choices.  <u>Id.</u>  On the page which the Commissioner cites *in support* of Ms. Seay's independent decision making abilities (AR578), the Commissioner fails to note the remainder of that same

record, where Ms. Casavan (Ms. Seay's therapist at the time) noted Ms. Seay's

need for continued treatment:

> Katrina will continue to receive mental health services as she
> continues to struggle with ongoing anxiety and at times, struggles
> with appropriate problem solving skills leading to poor decision
> making. She plans to continue to utilize therapy and seems to
> benefit from ongoing case management services as she has a
> limited support system and struggles with ongoing interpersonal
> relationship issues. Without further services, Katrina may turn to
> impulsive decision making leading to further legal issue, CPS
> involvement, and a setback in the progress she has made towards
> her mental health recovery.

See AR578. Though Ms. Seay's mood is noted as "pleasant," one wonders

"pleasant compared to what?" This note is does not paint the picture of

someone capable of day-in, day-out, full-time work, and is entirely consistent

with Ms. Howard's medical source statement.

Finally, in brief, the Commissioner argues the ALJ gave appropriate

weight to Ms. Howard's medical source statement because Ms. Seay's anxiety

and depression were "situational" and because the record generally shows that

therapy and medication improved Ms. Seay's symptoms. In her reply brief,

Ms. Seay addresses the merits of these contentions (i.e. that her mental

impairments are not "situational" and that her medications do not render her

able to function in the workplace).

The ALJ did not specifically articulate these two reasons for the

functional restrictions they found to be most appropriate regarding Ms. Seay's

work abilities. This justification *does* appear in the opinions of the State

Agency consultants (Drs. Muntz and Buchkoski), whose opinions the ALJ gave

"some weight." Both of those doctors referred to Ms. Seay's depression and

anxiety as "situational," and indicated that with medication compliance "it is assumed her depression symptoms . . . will be stable."  AR102, 114.

The court notes, however, that Dr. Pelc, who reviewed a more longitudinal medical record,[49] and whose opinion the ALJ gave "considerable weight" did *not* refer to Ms. Seay's anxiety and depression as "situational," and did not discuss her medications at all.  AR68-75.  In fact, Dr. Pelc referred to Ms. Seay's anxiety as "ongoing" and offered her "ongoing" anxiety as his reason for rating two of Ms. Seay's abilities in the "B" criteria (concentration, persistence and pace, and social functioning) in the moderate impairment category.  This opinion differed from the State Agency physicians who believed her mental impairments were "situational" and who opined all of her "B" criteria limitations were "mild" and who assumed her  symptoms would stabilize if she was compliant with her medication.[50]

The court notes that the Commissioner's assertions regarding the effects of Ms. Seay's medications are not borne out by the record.  First and foremost, Ms. Seay had recently changed medications at the time of the hearing—to Wellbutrin and back to Cymbalta.  AR703.  The records cited by the Commissioner in support of her assertion that Ms. Seay's medications "reasonably controlled" her mental impairments reveal the following:  In February, 2013 Ms. Seay reported Cymbalta worked well to manage her

---

[49] The ALJ erred by assigning "considerable weight" to Dr. Pelc's opinion for the reasons explained in the DISCUSSION section E, above.

[50] As discussed in the DISCUSSION Section G, below, Ms. Seay had been on new psychological medication for only a few months at the time of hearing.

anxiety, but in that same visit reported she still felt "paranoid" when out in public with her daughter. AR497.  When she reported trazadone was working well, it was for helping her sleep, not for her depression or anxiety.  AR581. The records cited by the Commissioner regarding Ms. Seay's medications (AR675, 680, 695, 700) each begin with the same phrase "she states the symptoms are chronic and fairly controlled."  Id.  Those same records, however, are followed by Ms. Seay's quotes from the particular day, including "I am horrible" and "I am not so great." Id.  Additionally, the "prescriber's evaluation" section of those same notes indicate that the "Lamictal [is] too sedating" "Hydroxyzine doesn't do anything," and "c/o anxiety, low energy." Id.  Whether Ms. Seay's medications improved her mental impairments to a degree which would facilitate substantial gainful employment is certainly not a foregone conclusion.

More importantly, however, because there is no mention of these issues by the consultant upon whose opinion the ALJ relied nor in the ALJ's written decision, the court is left to speculate whether the ALJ believed Ms. Seay's anxiety and depression impairments were "situational" and if so,  whether that belief had anything whatsoever to do with the ALJ's failure to assign greater weight to Ms. Howard's opinion.  The same is true for whether the ALJ believed Ms. Seay's medication compliance would affect her functional ability, and if so, whether that belief had anything whatsoever to do with the ALJ's failure to assign greater weight to Ms. Howard's opinion.

Ms. Howard saw Ms. Seay on a weekly basis and was in the best position to observe the effect Ms. Seay's medications had upon her anxiety, depression, and her ability to function in the workplace. Had the ALJ accepted Ms. Howard's medical source opinion, Ms. Seay would have been deemed disabled and entitled to benefits. "The reviewing court will not speculate on what basis the Commissioner denied a social security disability claim." Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011) (reversing and remanding because the ALJ did not specify how he reached his step five decision). See also Strayhorn v. Califano, 470 F. Supp. 1293, 1297 (E.D. Ark. 1979). There, it was explained why the reviewing court must be able to discern the ALJ's rationale for her decision. Id.

> In our view an examiner's findings should be as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.

Id. (citing Baerga v. Richardson, 500 F.2d 309, 312 (3rd Cir. 1974).

For all of these reasons, the ALJ's assignment of only "some weight" to Ms. Howard's opinion is not supported by substantial evidence. This case will be remanded for a proper consideration of all the evidence, including Ms. Howard's opinion, regarding the severity of Ms. Seay's impairments and their effect upon her ability to work.

## G. Whether the ALJ Applied the Proper Standard to Determine the Credibility of Ms. Seay and Her Mother's Testimony?

### 1. The Law Applicable to Credibility[51] Determinations

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. See SSR 16-3p; 20 C.F.R. § 416.929. Here, the ALJ found Ms. Seay had medically determinable physical[52] and mental impairments that could reasonably be expected to produce her symptoms in accordance with part 1 above. So the credibility determination rested on the second prong discussed above.

---

[51] The court notes that as of March 28, 2016, the Commissioner determined to discontinue the use of the term "credibility" in its sub-regulatory policy. See SSR 16-3p (which superseded SSR 96-7p). The Commissioner wanted to make clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character. Id. The court uses the term "credibility" herein because it is prevalent in the case law that has developed, the ALJ used that term (AR33), and the ALJ issued her decision under the prior SSR 96-7p because the ALJ's decision (Aug. 26, 2015), was issued before SSR 96-7p was superseded by SSR 16-30 (Mar. 28, 2016). Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

[52] As discussed previously, the ALJ did *not* herself find that Ms. Seay suffered from medically determinable physical impairments, most notably fibromyalgia, but the ALJ did adopt the opinions of physicians who *did* conclude she suffered from fibromyalgia. The ALJ then incorporated those physicians' opinions as to the effect of fibromyalgia into Ms. Seay's physical RFC.

In evaluating the second prong of the analysis, an ALJ must consider several factors. The factors to consider include: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner, 499 F.3d at 851 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole. Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed,

399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). If adequately supported, credibility findings are for the ALJ to make. Id. (citing Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cor. 2006)). Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations so long as they are supported by substantial evidence and good reasons. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

The Eighth Circuit has said "in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Woolf, 3 F.3d at 1213. So too, here: there is no question Ms. Seay experienced symptoms; the real issue is how severe those symptoms are. The Polaski factors assist the ALJ in making that determination.

### 2. Summary of Ms. Seay and her Mother's Statements

#### a. Ms. Seay

Ms. Seay reported on June 20, 2013, that she stopped working in October, 2012, "because of my conditions" generally, and also because of "sexual harassment [and] false claims." AR280. She listed her medical

conditions as:  fibromyalgia, anxiety, depression, migraines, back pain, anemia, leg length differential, and PTSD.  AR279.  She reported she took Cymbalta for her fibromyalgia and anxiety, flexoril for muscle relaxing, tramadol for pain, and Vicodin for pain.  AR282.  She described problems in concentrating and problems from migraine headaches.  AR289.  Dealing with the aftermath of childhood abuse was also noted by Ms. Seay as causing problems.  Id.

In a function report one month later, Ms. Seay answered the question, "How do your illnesses, injuries or conditions limit your ability to work?" by describing her mental impairments.  AR291.  She described severe anxiety that made her "mess up" on the job, "zone out" and interfere with sleep.  AR291-92. She described taking care of her own daily needs and those of her daughter's, but that she had more low-energy days than regular- or high-energy days. AR292.  She would only wash dishes when everything was dirty, and only bathe herself when she was dirty or smelly.  Id.  She described needing reminders to take her medications.  AR293.  She cooked meals, but only if they took less than 10 minutes to make.  Id.  She stated she had to take pain pills to stand up for more than 5 minutes.  Id.  She described going out to shop, including driving, when her emotions could "handle it" and only when needed. AR294.  She stated she could handle her own finances, including using a checkbook, paying bills, and counting change.  Id.

In the same function report, Ms. Seay described watching television daily, and chatting and playing games with friends on the internet daily.

AR295.  She stated she did not go out of the house unless it was for an

appointment or something necessary.  Id.  As to specific information about her

mental and physical abilities,[53] Ms. Seay chose not to answer the specific

questions; instead she merely wrote "my issues affect all of the above but my

medications make them tolerable."  AR296.

Ms. Seay stated she could walk 4 to 5 blocks before needing to rest

because of shortness of breath.  Id.  She stated she did not finish (movies,

conversations, chores, reading) what she started.  Id.  She stated she followed

written instructions for the first time very well, but did not follow spoken

instructions well.  Id.  She stated she did not get along well with authority

figures, noting she had recently been arrested for "arguing with cops."  AR297.

She stated she had unusual behavior or fears because of trauma that had

occurred in her life.  Id.

In a December 6, 2013, disability report, Ms. Seay stated she has anxiety

in public and problems with paperwork because she doesn't process

information correctly or turn things in on time.  AR311.  She described getting

anxious and angry when she doesn't understand something.  Id.

In an April 30, 2014, disability report, Ms. Seay described worsening

anxiety and depression.  AR318.  She also stated she was currently unable to

---

[53] The function report form asked Ms. Seay to indicate if her conditions affected her ability to do the following:  lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others.  AR296.  Obviously, it would have been helpful to have Ms. Seay answer the questions about these specific matters.

take her medications because she was pregnant again.  Id.  She described leaving her house less often.  AR318, 322.

In a January 8, 2016, typewritten statement to the Appeals Council, she described her working experience at Wal-Mart, saying that pain and mental impairments made it difficult to work.  AR341-42.  Her former boss enabled her to keep this job for a time by allowing her to work a great deal of the time in the cooler where she would have no contact with other people.  Id.  When this boss suddenly died, the new boss would not accommodate Ms. Seay and she could not perform the job as required.  Id.

In her testimony before the ALJ, Ms. Seay described having a car and driver's license which she used to drive once or twice a week.  AR63.  She agreed with the ALJ's description of her physical impairments consisting of fibromyalgia, migraine headaches, and scoliosis.  AR61-62.  She verified height and weight numbers that placed her in the extreme obesity Body Mass Index (BMI) category.  AR62.  See SSR 02-1p (BMIs over 40 are classified by the Commissioner as "extreme").  Ms. Seay agreed her mental impairments consisted of PTSD, anxiety, and depression.  AR64.

In terms of her ability to work, Ms. Seay testified solely to mental impairments and the impact they had on her ability to function socially.  AR66-68.  The only limitation on her physical functioning which she testified about was an inability to lift heavy boxes during her pregnancy.  AR67.

### b.    Wilma Goehring

In a third-party function report dated August 21, 2013, Wilma Goehring described her daughter's impairments as taking on a different personality out in public which wears her out, having a lot of migraines, having a physical problem with her hips which made stair climbing difficult, fear of the public, sleeping a lot, and cleaning house very little.  AR299-300.  Ms. Goehring stated Ms. Seay cared for her daughter and played video games, cooked frozen or prepared foods, and did laundry.  AR300-01.  Ms. Goehring said her daughter took care of her own personal needs and needed no reminders to take her medications.  AR300-01.  Although Ms. Goehring said Ms. Seay could do her own house and yard work, it might take all of one day or all of two weeks to finish.  AR301.  Having to venture outside her house caused so much stress that she was unable to do any housework on these days.  AR302.

Ms. Goehring linked her daughter's migraines to the stress of having to engage in social activities.  Id.  Ms. Goehring stated her daughter did her own shopping for food, clothing, toys and car needs, but said her ability to shop was affected by the amount of social stress involved.  Id.  Ms. Seay was able to handle her own finances, pay bills, and handle a checking account in Ms. Goehring's opinion.   Id.  Ms. Goehring described her daughter's condition as getting progressively worse, resulting in more reclusiveness and more pain.  AR303.  Ms. Seay did not leave her apartment if she did not have to according to her mother.  Id.

Ms. Goehring described her daughter's physical problems as "too open hips" which caused pain and got worse with each pregnancy. AR304, 306. She emphasized her daughter's social impairments. Id. She stated Ms. Seay was unable to handle stress, unable to get along with others, and that she feared other people, including Ms. Goehring sometimes. AR304-05. She attributed Ms. Seay's failure to hold any job to her fear of others and to her pain from "too open hips." AR306.

At the ALJ hearing, Ms. Goehring testified her daughter is "too paranoid" to allow others to help her. AR81. She stated Ms. Seay's emotional problems began at age 5 and progressively got worse. AR83. Ms. Goehring testified she obtained a psychology degree in an attempt to be the best mother she could be to Ms. Seay. Id. She opined Ms. Seay suffered from borderline personality disorder. Id. Ms. Seay's personality disorder resulted in her "going through" doctors, counselors, and attorneys as these professionals are unable to deal with Ms. Seay's frustration, paranoia and fear. AR83, 86.

She stated Ms. Seay was a good mom. AR85. Physically, Ms. Goehring again described Ms. Seay's problem as "too open hips." Id. She testified that fibromyalgia runs in their family and that the muscle aches exacerbate Ms. Seay's emotional issues. AR87.

### 3.     Analysis of the ALJ's Credibility Evaluations

The ALJ concluded the testimony of Ms. Seay and Ms. Goehring was "sincere," and that Ms. Seay's impairments could reasonably be expected to cause the alleged symptoms, but that "the intensity, persistence and limiting

effects of the symptoms are not entirely credible" for two reasons: (1) lack of support in the objective medical records and (2) inconsistency with opinion evidence from acceptable medical sources. AR35. Other than these two factors, the ALJ did not discuss any of the other Polaski factors. AR35-40.

The medical records for the period of disability in Ms. Seay's case—from May 31, 2013, to July 22, 2015—are significant for two features. First, Ms. Seay's primary impairment, as emphasized by Ms. Seay and Ms. Goehring almost to the exclusion of any other impairment—is her mental impairment(s). Despite this, Ms. Seay was not on any psychiatric medications until March 19, 2015, a mere four months prior to the ALJ hearing. AR670-71. At that time, she was prescribed Lamictal and hydroxyzine. AR671. When Ms. Seay came back for her next appointment on April 29, 2015, her psychiatric medications were changed. AR700-04. The Lamictal and hydroxyzine were discontinued and Ms. Seay was started on Wellbutrin and restarted on Cymbalta.[54] Id. There are no mental health medical records following this medication change to gauge how the medications affected Ms. Seay's ability to function.

---

[54] The parties' joint statement of facts describes Cymbalta as a psychiatric medication used to treat depression and anxiety. See Footnote 22, *supra*. However, Ms. Seay's medical records reflect it was prescribed for her for back pain, specifically for any pain not covered by Hydrocodone. AR433. She took Cymbalta from January 28, 2013, to May 5, 2013, and reported her pain was better with Cymbalta and that she "knew when she missed a dose." AR422. She quit taking Cymbalta May 5, 2013, when she suffered a miscarriage, AR527, 543, but went back on the drug sometime in October or November, 2013. AR543, 585. She was pregnant from approximately March, 2014, to January 21, 2015, during which time she stated she quit taking Cymbalta. AR772. She then resumed taking it April 29, 2015. AR700-04. Whether Cymbalta was prescribed for Ms. Seay as a psychiatric or pain medication, it appears she took it only sporadically because of her pregnancies.

The second notable feature of Ms. Seay's medical records for the period of disability is that she was pregnant three times during this two-year period and she discontinued all her medications while pregnant. Therefore, the symptoms—both mental and physical—could be expected to increase during these periods where medication was not being taken.

As to physical impairments, the ALJ noted that Ms. Seay reported only two migraines during a nine-month pregnancy, even though she was not taking any narcotics or Cymbalta during the pregnancy. AR36 (citing Ex. 19F at p. 12). In another medical record, the ALJ noted Ms. Seay reported her migraines were well-controlled with tramadol, but that she had run out of this medication, prompting her to report to the emergency room. AR35 (citing Ex. 8F at pp. 2, 4, 6, 15). The ALJ noted Ms. Seay had one acute episode of back pain from moving furniture in September, 2013, but her physical exam was normal even on this occasion, as well as other occasions. AR34-36. As to the entire host of physical and postural functions listed in Ms. Seay's function report, the ALJ noted Ms. Seay said her medications made all these functions "tolerable." AR33 (citing AR296).

The ALJ noted that during Ms. Seay's last pregnancy of record, a few weeks before she gave birth a drug screening test was positive for an unspecified drug of abuse, though the record noted Ms. Seay stated she had stopped taking narcotics months before. AR36 (citing AR772 dated December 23, 2014).

Not mentioned by the ALJ are numerous conflicts between Ms. Seay's statements about her functional abilities and Ms. Goehring's statements. For example, Ms. Seay said she needed reminders to take her medication while Ms. Goehring said she needed no reminders. Compare AR293 with AR301. Ms. Goehring stated Ms. Seay had no problems with her own personal care, while Ms. Seay stated she only bathed when she became stinky or had to go out of her house. Compare AR301 with AR292. While Ms. Seay said she could perform postural and physical actions so long as she took her medications, AR296, Ms. Goehring stated her daughter had difficulty with the following: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, use hands, and get along with others, AR304.

The ALJ should not, perhaps, accord great weight to Ms. Seay's own assessment of her mental functioning. Her medical records indicate she has difficulty acknowledging her psychiatric problems. AR670-71. However, the primary reasons cited by the ALJ for discounting Ms. Seay and Ms. Goehring's testimony as to the severity of symptoms was the fact that the medical evidence did not support their testimony.

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records

reflected that he did not pursue ongoing evaluation or treatment for his pain and he did not seek or take pain medication on a regular basis.  Wagner, 499 F.3d at 852-853.  See also Baker v. Barnhart, 457 F.3d 882, 892-894 (8th Cir. 2006) (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living--full self-care, driving a car, shopping, and running errands--a medical source opined that the claimant engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In Bentley, 52 F.3d at 785-786, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where the claimant had not sought medical treatment for his pain for a long period of time and was not taking any prescription medication for pain.  In addition, the record reflected that the claimant had applied for a number of jobs during his claimed disability period.  Id.

In Harvey, an ALJ who discredited the claimant's testimony as to limitations on his activities was affirmed where the evidence showed the claimant had made prior inconsistent statements to his physicians regarding his limitations and his asserted need to use crutches or a non-prescribed walker was inconsistent with statements made by the claimant on other occasions.  Harvey, 368 F.3d at 1015-1016.

In Guilliams, 393 F.3d at 802-803, the Eighth Circuit affirmed an ALJ's discrediting of the claimant's subjective complaints of back pain where claimant used a cane, but no medical prescription for the cane existed; where

several medical exams revealed the claimant to be in no significant distress; where MRIs of the spine revealed essentially normal findings; where the claimant's muscle mass was not atrophied despite his allegation of restriction of motion and diminishment of strength; where the claimant declined to follow medical advice regarding treatment of his pain; and where medical evidence demonstrated that pain medication alleviated the claimant's symptoms of pain.

In Dolph v. Barnhart, 308 F.3d 876, 879-880 (8th Cir. 2002), the ALJ's discrediting of the claimant's subjective complaints of pain from kidney disease and degenerative spine disease was affirmed where the claimant's records of her kidney disease showed "consistently stable renal function" and there was no record support for complaints of ongoing, severe, protracted discomfort.

An ALJ may consider whether an examining medical source determines that the claimant was malingering in assessing the credibility of the claimant's testimony as to subjective complaints of pain. Clay v. Barnhart, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was malingering cast suspicion on the claimant's credibility). "Especially in cases . . . where medical evidence is conflicting, a claimant's failure to seek treatment may buttress a particular physician's opinion." Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995).

Here, the ALJ failed to consider and discuss numerous Polaski factors: (1) whether Ms. Seay refused to follow medical treatment; (2) whether she had received only minimal medical treatment; (3) whether she took only minimal medications; (4) Ms. Seay's activities of daily living; and (5) the dosage,

effectiveness and side effects of medications. <u>Wagner</u>, 499 F.3d at 851. Nearly all of these factors favor crediting Ms. Seay's and her mother's testimony. Ms. Seay never refused to follow any medical treatment except to lose weight and get more exercise. She received far more than minimal treatment, traveling from Belle Fourche to Rapid City two or more times per month for counselling—a drive of an hour's duration or more. She took the medications she was prescribed when she was not pregnant, and she was prescribed some serious pain relief medications such as Vicodin, Hydrocodone, Flexeril, and Cymbalta. And her activities of daily living were not inconsistent with her described symptoms.

Even given all of this, were the court not already determined to remand this matter on the basis of other issues the court might affirm the ALJ's credibility determination. The evidence is certainly mixed and that—along with the deference due an ALJ's credibility determination—would combine to counsel that affirmance was in order. Except for the final <u>Polaski</u> issue—the dosage, effectiveness, and side effects of medication.

Ms. Seay had only been prescribed psychiatric medications a few short months before the ALJ hearing. And even in that short time period, her medications had been completely changed to something different during that time. There is no record indicating how the final prescribed medications worked to control Ms. Seay's symptoms. Remand is warranted in this case based on other issues. The court also remands as to the <u>Polaski</u> issue so as to give the ALJ an opportunity to obtain Ms. Seay's mental health and medical

records post-April, 2015.  By doing so, the ALJ will be able to address how Ms.

Seay's prescribed psychiatric medications are affecting her ability to function.

On remand, the ALJ should also consider and discuss how the other <u>Polaski</u>

factors impact the credibility decision.

**H.     Whether the ALJ Erred By Relying on Total Numbers of Jobs in the United States at  Step Five?**

At step five, the ALJ found there were other jobs Ms. Seay could do with

her RFC.  AR41.  The ALJ's conclusion was based on testimony from the VE

that there were 271,000 merchandise marker jobs "in the United States."

AR89.  He also testified there were 52,000 router jobs "in the United States."

AR89.  By testifying to the number of jobs available in the entire United States,

Ms. Seay alleges the VE, and the ALJ, used the wrong standard.  Her argument

is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d) "Disability" defined

> (1)The term "disability" means—
>> (A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

* * *

> (2) For purposes of paragraph (1)(A)—
>> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

116

which exists in the national economy, regardless of
whether such work exists in the immediate area in
which he lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he applied for
work. ***For purposes of the preceding sentence*** (with
respect to any individual), ***"work which exists in the
national economy" means work which exists in
significant numbers either in the region where
such individual lives or in several regions of the
country.***

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which

exists in the national economy" is a term of art in Social Security law.  It does

not mean work in the entire United States.  Instead, it means "work which

exists in significant numbers either in the *region* where such individual lives or

in *several regions* of the country."  Id. (emphasis added).  Now, what does that

definition mean exactly?

The Commissioner argues it need not establish jobs exist in Ms. Seay's

immediate area.  Yes.  That is true, but it begs the question.  The

Commissioner *does* have to show that jobs exist in Ms. Seay's "region" or in

"several regions of the country."  We know from the statutory language that

"region" does *not* mean "immediate area," but defining what a term does not

mean is not all that helpful in defining what it *does* mean.

The Commissioner's regulation, 20 C.F.R. § 404.1566, is likewise

unhelpful.  It does not define "region."  Id.  It says that "region" is not equal to

"immediate area."  Id. at (a)(1).

In <u>Barrett v. Barnhart</u>, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region. This sentiment is paralleled in the Commissioner's regulation where it states: "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.' We will not deny you disability benefits on the basis of the existence of these kinds of jobs." 20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part." Webster's New World Dictionary, at 503 (1984). "A subdivision of the earth or universe." OED (3d ed. Dec. 2009). We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country. <u>See</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b). The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole. The court concludes, as it must, that "nationwide" does not truly mean "nationwide." Such is the nature of agency law. Instead, at step five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation). <u>Id.</u>

The Commissioner cites <u>Johnson v. Chater</u>, 108 F.3d 178 (8th Cir. 1997), in support of the assertion that in the VE's testimony in this case was sufficient to uphold the ALJ's decision at step five. The <u>Johnson</u> decision is inapposite. In the <u>Johnson</u> case, the claimant appealed the issue whether the VE's testimony was sufficient to prove that there were jobs existing in substantial numbers in the national economy. <u>Id.</u> at 178. The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer. <u>Id.</u> at 179. The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide. <u>Id.</u> Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs. <u>Id.</u> at 180 n.3. The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." <u>Id.</u> at 180.

The facts in <u>Johnson</u> stand in stark contrast to the facts in Ms. Seay's case. In <u>Johnson</u>, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. <u>Id.</u> at 179. Here, the VE testified *only* to the number of jobs available "in the United States." AR89. As established above, both § 423(d)(2)(A) and § 404.1566 require more specificity than that. The ALJ and the VE must find that substantial numbers of jobs are available in Ms. Seay's region or in several regions. <u>See</u> <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 (8th Cir. 2004 (the ALJ must find at step five that claimant is "capable of

performing work that exists in significant numbers within the *regional and national* economies.") (emphasis added).

The burden on is on the Commissioner at step five of the sequential analysis. <u>Johnson</u>, 108 F.3d at 180. Therefore, the absence of valid evidence of substantial numbers of jobs in Ms. Seay's "region" or in "several regions" is an absence of evidence that cuts against the Commissioner. The failure of proof requires remand to the agency to further develop the facts at step five.

## I.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Seay requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative, reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. <u>Buckner v. Apfel</u>, 213

F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be developed, clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, Katrina Seay's motion to reverse [Docket No. 17] is granted and the Commissioner's motion to affirm [Docket No. 20] is denied.  The Commissioner's decision is

REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C.

§ 405(g), sentence four.

DATED March 27, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge